KEKER, VAN NEST & PETERS LLP
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
MATAN SHACHAM - # 262348
mshacham@keker.com
JACQUELINE CONCILLA - # 335733
jconcilla@keker.com
NATALIE R. HEIM - # 340549
nheim@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant TWILIO INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH BENDER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TWILIO INC., a Delaware corporation,<br><br>Defendant. | Case No. 3:24-cv-04914-AMO<br><br>**DEFENDANT TWILIO INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**Pursuant to Fed. R. Civ. P. 12(b)(6).**<br><br>Date:     January 23, 2025<br>Time:     2:00 p.m.<br>Dept.:     10, 19th Floor<br>Judge:     Hon. Araceli Martínez-Olguín<br><br>Date Filed: August 8, 2024<br><br>Trial Date: None Set |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ................................................................................................2

II.  BACKGROUND .................................................................................................4

    A.   Twilio is a software service provider that offers its business clients tools that they configure and deploy to collect, consolidate, and process end-user data for the clients' own purposes. ..........................................................4

    B.   Plaintiff downloaded and used the Calm App and thereby agreed to Calm's Privacy Policy, which discloses that it collects and shares in-app user data with third parties for analytics and advertising purposes.......................................6

    C.   Plaintiff ignores Calm's Privacy Policy disclosures and makes unwarranted assumptions about Twilio's software and Calm's use thereof................................8

III. ARGUMENT ....................................................................................................10

    A.   Plaintiff's claims all fail because Calm disclosed that it collects and shares in-app activity with third-party service providers for advertising purposes. .........10

    B.   Plaintiff's claims fail because Twilio required Calm to disclose its data practices and thus never knowingly and intentionally invaded Plaintiff's privacy....................................................................................................................12

    C.   Plaintiff's CIPA claim should be dismissed because the party exception applies, and Plaintiff otherwise fails to plead the elements. ...................................13

        1.   Twilio is exempt from Section 631 under the "party exception" rule. ...........................................................................................................14

        2.   Plaintiff cannot state a wiretapping claim under the first clause of Section 631 as it does not apply to internet communications....................16

        3.   Plaintiff has failed to state a claim under the second clause of Section 631 because he does not adequately allege that Twilio intercepted the contents of his communications while in transit. ..............17

        4.   Plaintiff cannot state a claim under the third clause of Section 631 because it is derivative and fails for the same reasons..............................19

    D.   Plaintiff's Federal Wiretap Act claim fails as a matter of law because that Act is a one-party consent statute and Calm consented to the collection. .............19

    E.   Plaintiff fails to state a CDAFA claim because he insufficiently pleads the requisite acts, access, and damages.........................................................................20

IV.  CONCLUSION...................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Augustine v. Great Wolf Resorts, Inc.*,
No. 23-CV-00281-DMS-DTF, 2024 WL 3450967 (S.D. Cal. July 18, 2024) .......................19

*Bui-Ford v. Tesla, Inc.*,
No. 4:23-CV-02321, 2024 WL 694485 (N.D. Cal. Feb. 20, 2024) ............................10, 20, 21

*Cody v. Ring LLC*,
No. 23-CV-00562-AMO, 2024 WL 735667 (N.D. Cal. Feb. 22, 2024)....................... *passim*

*Cottle v. Plaid Inc.*,
536 F. Supp. 3d 461 (N.D. Cal. 2021) ....................................................................22

*Doe I v. Google LLC*,
— F. Supp. 3d ——, 2024 WL 3490744 (N.D. Cal. Jul. 22, 2024) ............................... *passim*

*In re Ethereummax Inv.*,
No. CV 22-00163-MWF-SKX, 2023 WL 6787827 (C.D. Cal. June 6, 2023) .......................21

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................................................................20

*Flores-Figueroa v. United States*,
556 U.S. 646 (2009)....................................................................12

*Garcia v. Enter. Holdings, Inc.*,
78 F. Supp. 3d 1125 (N.D. Cal. 2015) ............................................................11, 12

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ....................................................12, 16, 19

*Hammerling v. Google, LLC*,
No. 22-17024, 2024 WL 937247 (9th Cir. Mar. 5, 2024)........................3, 10, 12, 18

*Heiting v. Taro Pharms. USA, Inc.*,
709 F.Supp. 3d 1007 ....................................................................... *passim*

*James v. Allstate Ins. Co.*,
No. 3:23-CV-01931-JSC, 2023 WL 8879246 (N.D. Cal. Dec. 22, 2023)................................2

*Javier v. Assurance IQ, LLC*,
No. 4:20-CV-02860-JSW, 2021 WL 940319 (N.D. Cal. Mar. 9, 2021)................................10

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002) ....................................................................20

*Love v. Ladder Fin., Inc.*,
  No. 23-CV-04234-VC, 2024 WL 2104497 (N.D. Cal. May 8, 2024) ...............................4, 19

*Meta Platforms, Inc. v. BrandTotal Ltd.*,
  605 F. Supp. 3d 1218 (N.D. Cal. 2022) ...........................................................................21

*Pratt v. Higgins*,
  No. 22-CV-04228-HSG, 2023 WL 4564551 (N.D. Cal. July 17, 2023) ...............................22

*Pyankovska v. Abid*,
  65 F.4th 1067 (9th Cir. 2023) ...................................................................................4, 19

*Quigley v. Yelp, Inc.*,
  No. 17-CV-03771-RS, 2018 WL 7204066 (N.D. Cal. Jan. 22, 2018)....................................17

*Rodriguez v. Ford Motor Co.*,
  No. 3:23-cv-000598-RBM, 2024 WL 1223485 (S.D. Cal. Mar. 21, 2024)............................16

*Rodriguez v. Google LLC*,
  No. 20-CV-04688-RS, 2022 WL 214552 (N.D. Cal. Jan. 25, 2022)....................................18

*Roe v. Amgen Inc.*,
  No. 2:23 CV-07448-MCS-SSC, 2024 WL 2873482 (C.D. Cal. June 5, 2024) .............3, 20, 22

*Silver v. Stripe Inc.*,
  No. 4:20-CV-08196-YGR, 2021 WL 3191752 (N.D. Cal. July 28, 2021)
  ....................................................................................................................2, 10, 11, 12

*Smith v. Facebook, Inc.*,
  745 F. App'x 8 (9th Cir. 2018) ......................................................................3, 10, 11, 12

*Spy Dialer, Inc. v. Reya LLC*,
  No. ED-CV-181178-FMO-SHKx, 2018 WL 3689554 (C.D. Cal. July 26,
  2018) ......................................................................................................................13

*Swarts v. Home Depot, Inc.*,
  689 F. Supp. 3d 732 (N.D. Cal. 2023) .............................................................................4, 16

*Turner v. Nuance Commc'ns, Inc.*,
  No. 22-CV-05827-DMR, 2024 WL 2750017 (N.D. Cal. May 28, 2024) .............................13

*United States v. Christensen*,
  828 F.3d 763 (9th Cir. 2015) .........................................................................................12

*Valenzuela v. Keurig Green Mountain, Inc.*,
  674 F. Supp. 3d 751 (N.D. Cal. 2023) .............................................................................16

*Williams v. DDRMedia, LLC*,
  2023 WL 5352896 (N.D. Cal. Aug. 18, 2023) ......................................................................14

iii

*Yockey v. Salesforce, Inc.*,
  688 F. Supp. 3d 962 (N.D. Cal. 2023) ...................................................................16

*Yoon v. Lululemon USA, Inc.*,
  549 F. Supp. 3d 1073 (C.D. Cal. 2021) .................................................................19

*In re Zynga Privacy Litigation*,
  750 F.3d 1098 (9th Cir. 2014) ...............................................................................18

**State Cases**

*Ghirardo v. Antonioli*,
  14 Cal. 4th 39 (1996) .............................................................................................22

*Rogers v. Ulrich*,
  52 Cal. App. 3d 894 (1975) ...................................................................................14

*Stark v. Super. Ct.*,
  52 Cal. 4th 368 (2011) ...........................................................................................12

**Federal Statutes**

Federal Wiretap Act, 18 U.S.C. § 2510, *et. seq.* ........................................... *passim*

**State Statutes**

Cal. Civ. Code § 1798.140(ag) ...................................................................................2

California Comprehensive Computer Data Access and Fraud Act,
  Cal. Pen. Code § 502 ...................................................................................... *passim*

California Invasion of Privacy Act,
  Cal. Pen. Code § 631 ...................................................................................... *passim*

**Rules**

Federal Rules of Civil Procedure Rule 12(b)(6) ..........................................................1

**TWILIO'S NOTICE OF MOTION AND MOTION TO DISMISS TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on January 23, 2025, at 2:00 p.m.[1], or as soon thereafter as this matter may be heard, in Courtroom 10 of the Honorable Araceli Martínez-Olguín, located on the 19th Floor of the Phillip Burton Federal Building and U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Twilio Inc. ("Defendant") will and hereby does move to dismiss the complaint filed by Plaintiff Noah Bender in its entirety and with prejudice for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The specific issues raised through Twilio's motion to dismiss are as follows:

1. Whether Plaintiff's entire action fails because he knowingly authorized the collection and/or sharing of his personal information by and with third-party service providers like Twilio;

2. Whether Plaintiff's entire action fails because Twilio did not knowingly and intentionally invade his privacy and therefore lacked the requisite criminal *mens rea* to satisfy his claims;

3. Whether Plaintiff has failed to state a claim under the California Invasion of Privacy Act, Cal. Pen. Code § 631;

4. Whether Plaintiff has failed to state a claim under the Federal Wiretap Act, 18 U.S.C. § 2510, *et. seq.*;

5. Whether Plaintiff has failed to state a claim under the California Comprehensive Computer Data Access and Fraud Act, Cal. Pen. Code § 502.

This motion is based on this Notice of Motion, the following memorandum of points and authorities, Twilio's concurrently filed request for judicial notice and the supporting declaration of Natalie Heim with the exhibits attached thereto, and on all pleadings and papers on file or to be filed in this action, on the arguments of counsel, and on any other matters properly before the Court.

---

[1] The parties have stipulated to and proposed a lengthened schedule for briefing Twilio's Motion to Dismiss and Twilio's motion to compel individual arbitration, all filed concurrently.

## I.     INTRODUCTION

Plaintiff Noah Bender brings a putative class action complaint against software service-provider Twilio Inc., seeking to profit from a recent wave of online privacy litigation. But Twilio never invaded his privacy, and his complaint fails to state a claim.

Twilio provides its clients, consumer-facing online businesses, with software tools that allow those businesses to better communicate with end users who interact with their websites and apps.[2] Plaintiff alleges that he downloaded and used a subscription-based app for meditation and sleep from Calm (the "Calm App") on his Android device within the last year. Complaint ("Compl.") ¶ 30. He alleges that the Calm App's developers embedded Twilio's "Segment SDK" into the Calm App, *id*. ¶ 31, and that, unbeknownst to him, the Software Development Kit ("SDK") allows Twilio to collect his "In-App Activities" within the Calm App, such as keystrokes, button presses, search terms, and page views, and he speculates that Twilio uses that data for its own purposes. *Id*. ¶¶ 17, 43, 45. Based on those allegations, Plaintiff brings privacy-related claims against Twilio under three criminal statutes: the California Invasion of Privacy Act ("CIPA"), the Federal Wiretap Act, and California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"). Plaintiff further seeks to represent a class of users of over 11,000 unidentified mobile apps with the "Segment SDK" embedded. Compl. ¶ 34.

Like many other CIPA and invasion-of-privacy class actions brought against service providers for offering internet software to a website operator for a lawful purpose, this action should be dismissed for failing to state a claim. *See, e.g.*, *Doe I v. Google LLC*, — F. Supp. 3d —, 2024 WL 3490744, at *3-*5 (N.D. Cal. Jul. 22, 2024) (lack of intent); *Silver v. Stripe Inc.*, No. 4:20-CV-08196-YGR, 2021 WL 3191752, at *5 (N.D. Cal. July 28, 2021) (plaintiff consented based on privacy policy); *James v. Allstate Ins. Co.*, No. 3:23-CV-01931-JSC, 2023 WL 8879246, at *3 (N.D. Cal. Dec. 22, 2023) (party exception applied); *Cody v. Ring LLC*, No. 23-

---

[2] Throughout this Motion, Twilio has used the term "clients" to refer to Twilio's business clients who operate online websites or mobile apps and purchase Twilio's software services. Twilio refers to consumers, such as Plaintiff, who use those websites or mobile apps, as "end users." Twilio refers to itself as a "service provider" in accordance with the term and meaning provided by the CCPA. Cal. Civ. Code § 1798.140(ag).

CV-00562-AMO, 2024 WL 735667, at *6 (N.D. Cal. Feb. 22, 2024) (no real-time interception); *Roe v. Amgen Inc.*, No. 2:23 CV-07448-MCS-SSC, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024) (federal wiretapping claim "barred pursuant to the one-party consent provision"); *Heiting v. Taro Pharms. USA, Inc.*, 709 F.Supp.3d 1007, ___ (lack of access and damages). Here, as in those cases, Plaintiff's claims fail for several independent and overlapping reasons.

*Disclosure:* Most fundamentally, Plaintiff's complaint should be dismissed in its entirety because Calm informs its end users via its Privacy Policy that it collects, and allows its service providers to collect, end-users' In-App Activity for analytics and advertising purposes. Heim Declaration ("Heim Decl."), Ex. C (Privacy Policy). Calm's Privacy Policy is fatal to all three of Plaintiff's claims, which require him to establish that he did not consent to the data practices at issue. *See, e.g.*, *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (affirming dismissal of privacy claims based on disclosures in privacy policy); *Hammerling v. Google, LLC*, No. 22-17024, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (same). The Google Play store—where Plaintiff would have downloaded the Calm app—also discloses that the Calm app might collect and share activity-related data with third parties.

*No intent:* Plaintiff also has not pleaded—and cannot plead—that Twilio knowingly and intentionally invaded his privacy, as required for each of his claims. To the contrary, Twilio's contract with Calm requires Calm to provide all necessary disclosures and secure its end users' consent before using Twilio's software. Heim Decl., Exs. F-I (Twilio Software Contract and Business Terms). Moreover, Twilio offers a *client-configured* SDK that only collects data at the direction and configuration of its clients, meaning that the clients, not Twilio, decide what data (if any) will be collected. There are no allegations that Twilio intended for Calm to use its software to collect end user information without consent, or that it knew that Calm was doing so (which it was not), requiring dismissal of the entire action. *See Doe I*, 2024 WL 3490744, at *4-*5.

*CIPA:* Beyond those global flaws, Plaintiff's CIPA claim suffers from several statutory defects requiring dismissal. Twilio is exempt from Section 631 under the "party exception" rule. Section 631 does not apply to service providers like Twilio that merely provide a tool for a party to collect and analyze its own data, particularly where there are no well-pleaded allegations that

Twilio is capable of using the data for its own purposes. Also, Plaintiff's CIPA wiretapping claim fails because courts "uniformly" agree that claim does not apply to the internet. *See Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 743 (N.D. Cal. 2023). And Plaintiff's CIPA interception claim fails because he has not alleged that Twilio "intercepted" his "communications" while "in transit" or learned their "contents." *See Cody*, 2024 WL 735667, at *6. Lastly, Plaintiff has no well-pleaded allegations to establish a CIPA claim under the derivative "use" clause. *See Love v. Ladder Fin., Inc.*, No. 23-CV-04234-VC, 2024 WL 2104497, at *2 (N.D. Cal. May 8, 2024).

**Federal Wiretap Act:** Plaintiff's federal wiretapping claim must be dismissed because the Wiretap Act is a one-party consent statute. *Pyankovska v. Abid*, 65 F.4th 1067, 1074 (9th Cir. 2023). Plaintiff's own allegations establish, at the very least, that Calm chose to integrate the Segment SDK into its mobile app, and thus, consented to Twilio's alleged data collection and sharing. Compl. ¶ 31. This claim also fails for all the same reasons as the CIPA claim.

**CDAFA:** The CDAFA claim also fails because Plaintiff does not plead sufficient facts to establish the specific "acts" that constitute each separate CDAFA offense, how Twilio "accessed" his mobile device, or any "damage or loss" within the meaning of the statute. *See Heiting*, 709 F. Supp. 3d at 1020.

In sum, Plaintiff ignores the disclosures he consented to in Calm's Privacy Policy and seeks to hold its third-party service provider, Twilio, liable under criminal statutes for merely providing lawful back-end services to the Calm App. His claims find no basis in the law and Twilio respectfully requests that the Court dismiss this action with prejudice.

## II.    BACKGROUND

### A.    Twilio is a software service provider that offers its business clients tools that they configure and deploy to collect, consolidate, and process end-user data for the clients' own purposes.

Twilio is a software service provider that offers a variety of tools to help its business clients, who operate websites and mobile applications, communicate with their end users. To help those businesses communicate with their users, Twilio enables them to process their first-party data, *i.e.*, data that Twilio's clients collect from their direct interactions with end users of their websites and apps. Heim Decl., Ex. J; *see also* Ex. R (describing first-party data as "customer

data that's directly collected and owned by the organization doing business with them"). This business model is in contrast with that of data brokers, *i.e.*, companies that collect, aggregate, and sell consumer data from across various businesses. *Id.*, Ex. K ("First-vs-Third Party Data"); *see also* Ex. U ("Cookies, Compliance, and Customer Data"). In other words, any data collection and processing done by Twilio is done solely at the direction of and in service of Twilio's individual clients, and that data is not bought and sold to other companies. *Id.*; *see also* Ex. G ¶ 4.2 (Twilio Platform Agreement); Ex. H (Data Protection Addendum ("DPA") (incorporated by reference into Platform Agreement) ¶¶ 4-5.

The "Segment SDK" (*i.e.*, software development toolkit) is an umbrella term for various tools that Twilio offers. *See* Compl. ¶ 2. One tool within the Segment SDK is the "Connections" product, which provides standardized code that clients can configure to collect data regarding actions ("events") end users take when using their apps. Heim Decl., Exs. J, T; *see also* Compl. ¶ 13. Twilio's clients must modify and customize the standard code, however, to determine which "events" (if any) they will collect from their end users. *See* Heim Decl., Ex. J ("What you plan to track will vary depending on your business."); Ex. Q (Native Mobile Spec) (describing common blueprint of "events" tracked in mobile applications).

In addition, Twilio offers various products such as "Unify," "Engage," and "CustomerAI." Compl. ¶¶ 25-29 (quoting Twilio webpages discussing these features); s*ee also* Heim Decl., Exs. L-Q (Twilio webpages). These products are optional, and using each of them requires Twilio clients to make a supplemental purchase that many decide not to make. *See id.*, Ex. P. Unify enables Twilio's clients to consolidate data about their end users in one place, which is helpful for businesses who interact with the same customers via multiple channels, such as both a website and a mobile application. *See* Heim Decl., Exs. J, L, N. Engage allows Twilio's clients to use their end-user data to personalize customer experiences (*e.g.*, creating an audience consisting of the client's frequent purchasers to send those users helpful promotions). *See id.*, Ex M. And CustomerAI allows clients to better tailor promotions based on end users' potential interests. *See id.*, Ex. O.

None of Twilio's products—even supplemental products like Unify—allow it to either aggregate data across different clients or use a client's first-party data for Twilio's own purposes. Rather, Twilio specifically designs its products to avoid cross contamination of data between its various clients. *See id*. ¶ 10, Ex. I (Security Overview) ("Twilio APIs are designed and built to identify and allow authorized access only to and from Customer Data identified with customer specific tags. These controls prevent other customers from having access to Customer Data."). And Twilio is contractually barred from using or divulging the data for any purpose other than its clients'. *Id*., Ex. H (DPA), Sch. 1, ¶ 1 ("Twilio does not sell Customer's personal data or Customer end users' personal data and does not share such end users' information with third parties for compensation or for those third parties' own business interests."); *id.* Sch. 4, ¶ 11 ("Twilio is a service provider when processing Customer Content.").

> **B.   Plaintiff downloaded and used the Calm App and thereby agreed to Calm's Privacy Policy, which discloses that it collects and shares in-app user data with third parties for analytics and advertising purposes.**

Plaintiff alleges that he "downloaded and used" the Calm App on his Android mobile device in the last year and the "developers of the Calm mobile app embedded the Segment SDK into its mobile app[.]" Compl. ¶¶ 30-31. To download the Calm App on an Android device, a user must first navigate to the Google Play Store and look up the Calm App. *Id*. ¶ 2, Ex. A. Once the user selects the Calm App from the Google Play Store menu, the user is taken to the Calm App User Interface contained within the Google Play Store, which has a section devoted to data privacy disclosures entitled "Data Safety." *Id.*, Ex. A. These disclosures inform users before they download the app that the app may "collect" several categories of information including "personal info," "App activity," "Health and fitness" info, "Device or other IDs," and "financial info." *Id.* It also discloses that the app "may share" certain data "with third parties," such as "App activity," and "Device or other IDs." *Id.*

Then, once a user downloads the Calm App onto his device, all users are prompted to create a Calm account or otherwise log-in to an existing account. *Id.* ¶ 3, Ex. B. The Calm App Log-in Page informs users that "[b]y tapping Continue or logging into an existing Calm account, you agree to our <u>Terms</u> and acknowledge that you have read our <u>Privacy Policy</u>[.]" *Id.* The

underlined terms hyperlink to the relevant policies. *Id.; see id.*, Exs. C-E (Calm's Privacy Policies), V-W (Calm's Terms).

Within its Privacy Policy, Calm discloses that it collects, aggregates, and shares app users' personal information for analytics and advertising. First, in the section entitled "**Collection of Information**," Calm details the categories of information that Calm collects from users, including: (1) personal details (*e.g.*, name, email address, linked social media details), (2) views and opinions (*e.g.*, feedback, survey responses, and other information included within user interactions), (3) information provided by users (*e.g.*, goals, sleep habits, and moods), (4) usage information (*e.g.*, the session, videos, content, viewed and/or accessed on the app), (5) transactional information; (6) log information (*e.g.*, web browser, pages viewed, IP address); (7) device information; (8) communications (*e.g.*, chat messages, phone, or video calls); and (9) derived information (*e.g.*, use of IP address to approximate location and guesses about age and gender, and likelihood of continued app use). *Id.*, Ex. C (Calm's Privacy Policy).[3]

Then, in the section entitled "**Use of Information**," Calm explains the various ways it uses the information it collects, including in relevant part to "monitor and analyze trends, usage, and activities" on the app and to "personalize [users] online experience and the advertisements [they] see on other platforms." *Id.* And under the heading titled "**Disclosures of Information,**" Calm broadly discloses that it may share "information about [users]" with "***contractors that perform services for us***, including analytics providers, advertising partners, and other service providers." *Id.* (emphasis added). As the Twilio Software Contract and Twilio Terms demonstrate, Twilio is one such "contractor." *Id.*, Exs. F-I; *see also* Twilio's Request for Judicial Notice iso Twilio's Motion to Dismiss ("RJN") at 5, 8.

Finally, in the "**Advertising and Analytics Services Provided by Others**" section, Calm explains that it "allow[s] others to provide analytics services and serve advertisements on

---

[3] The complaint does not allege the specific date upon which Plaintiff downloaded the Calm App or created an account but merely indicates that Plaintiff downloaded the Calm App "within the last year." Compl. ¶ 30. Twilio has thus sought notice of the Privacy Policies in effect from August 8, 2023 (a year preceding the complaint), through the present. *See* Heim Decl., Exs. C-E. For purposes of this Motion, there are no material differences between the versions of the Privacy Policy. For ease, Twilio has relied on the current version (Exhibit C) throughout.

[Calm's] behalf across the web and other online services" and that those entities use "technologies to collect information about your use of the Services and other websites and online services, including your IP address, device identifiers, web browser, mobile network information, pages viewed, time spent on pages or in apps, links clicked, and conversion information" and that "Calm and others may use this information to, among other things, analyze and track data, determine the popularity of certain content, deliver advertising and content targeted to your interests, and better understand your online activity." *Id.*

These disclosures are required by the Twilio Software Contract and Twilio's Business Terms. *Id.*, Exs. F-I; *see also* RJN at 8 (citing Compl. ¶¶ 2, 31, 52, 26-29). Specifically, Calm "represents and warrants that it has provided and will continue to provide adequate notices, and that it has obtained and will continue to obtain the necessary permissions and consents, to provide Customer Data to Twilio for processing[.]" Heim Decl., Ex. G ¶ 5.3; Ex. H (Twilio's publicly available DPA) ¶ 4 ("Customer is responsible for ensuring that . . . it has, and will continue to have, the right to transfer, or provide access to, personal data to Twilio for processing[.]").

### C.    Plaintiff ignores Calm's Privacy Policy disclosures and makes unwarranted assumptions about Twilio's software and Calm's use thereof.

Plaintiff alleges that "[n]either Defendant nor Calm informed Plaintiff" that "if he used the Calm app, Defendant would collect his personally identifiable information and In-App Activity." Compl. ¶ 33. But the Complaint ignores the disclosures contained in Calm's Privacy Policy, which he consented to when he used the Calm App. *See* Heim Decl., Exs. A-E.

Plaintiff then alleges that the "Segment SDK" allows Twilio "to intercept communications between Plaintiff and Calm," such as his "search terms, keystrokes, page views, button presses, and other choices" (collectively "In-App Activity"). Compl. ¶¶ 2, 17, 31. Plaintiff does not allege when or how this interception occurs and makes no well-pleaded allegations about any particular information actually collected about him. Indeed, Plaintiff fails even to allege which Segment tool Calm "embeds" into its App and which tool he contends is responsible for the alleged "intercept[ion]." *See* Compl. ¶ 31. Further, Plaintiff offers no well-pleaded facts for his allegations that his "communications" were collected. Instead, his allegations about In-App

Activities appear to be based on generic marketing language on Twilio's website about what types of "events" Twilio's clients *could* collect. *See, e.g.*, Compl. ¶¶ 16-18, 57, 43; *but see* Heim Decl., Ex. Q (Native Mobile Spec) (describing common blueprint of "events" tracked in mobile applications and failing to list search terms or results); Ex. R (describing four different types of end-user data a business *might* collect).

Finally, Plaintiff makes a handful of conclusory allegations about the ways in which Twilio purportedly uses Calm's end user data for its "own purposes." *See* Compl. ¶¶ 25-29, 60-61. But these allegations are unsupported by any well-pleaded facts and are instead based on unsupported assumptions and a fundamental misunderstanding of Twilio's services. *See* Heim Decl., Exs. F-I, J-T. Specifically, Plaintiff alleges that Defendant Twilio "used Plaintiff's and the California Subclass's In-App Activity to correlate data across various mobile apps to create a unified customer profile, to make various behavioral predictions, and shared that data with third parties including advertisers and other platforms." Compl. ¶¶ 60-61. These allegations appear to refer to and mischaracterize generic product descriptions regarding Twilio's Unify, Engage, and CustomerAI products. *See* Heim Decl., Exs. L-Q. But Plaintiff never alleges that Calm actually uses those products. Nor could he do so, because Calm does not. *Id.*, Ex. F (Calm's Twilio Order Form). More fundamentally, however, Plaintiff misdescribes the materials he relies on, which detail products Twilio offers **to its clients** so that clients can decide what data to collect on their end-users, and then process this **end-user data for their own purposes**. None of the materials Plaintiff relies on suggest that Twilio combines the data of multiple clients or uses its product offerings for Twilio's own purposes.

Based on these threadbare and misleading allegations and bereft of any well-pleaded facts, Plaintiff nonetheless contends that Defendant Twilio violated his privacy rights under three *criminal* statutes: CIPA, the Federal Wiretap Act, and CDAFA. He also seeks to represent a California and national class of "All individuals who downloaded and used an app on their mobile

device (1) with Twilio's Segment SDK embedded into the app[4] and (2) that did not publicly disclose 'Twilio' in any of the app's notices or disclosures." Compl. ¶ 34.

### III.   ARGUMENT

#### A.   Plaintiff's claims all fail because Calm disclosed that it collects and shares in-app activity with third-party service providers for advertising purposes.

Each of Plaintiff's three claims require him to establish that he did not consent to Calm collecting and sharing his data. *See* Cal. Penal Code § 631 (CIPA) (imposing liability only for interception "without the consent of all parties"); 18 U.S.C. § 2511(2)(d) (Federal Wiretap Act) (interception "shall not be unlawful . . . [where] one of the parties to the communication has given prior consent to [the] interception"); Cal. Pen. Code § 502(c)(1), (c)(2), (c)(7) (CDAFA) (the impermissible act must be done "without permission" to be punishable); *see also Bui-Ford v. Tesla, Inc.*, No. 4:23-CV-02321, 2024 WL 694485, at *5 (N.D. Cal. Feb. 20, 2024) ("Liability under [§] 502(c) [of CDAFA] turns on . . . whether there was 'permission' to engage in those acts.").

Numerous courts have dismissed privacy claims for failure to plead lack of consent where terms of service or privacy policies disclose the data practice at issue. *See, e.g.*, *Smith*, 745 F. App'x at 9 (affirming dismissal of pleadings, including California and Federal wiretap claims, where the practice complained of "f[ell] within the scope of Plaintiffs' consent to Facebook's Terms and Policies."); *Hammerling v. Google, LLC*, No. 22-17024, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024) (holding privacy claim was "properly dismissed" where the privacy policy "expressly disclosed Google's intention to track their activity on third-party apps"). Consent is properly considered on a motion to dismiss privacy claims. *See Silver*, 2021 WL 3191752, at *2 (noting that "[c]onsideration of consent is appropriate on a motion to dismiss where lack of consent is an element of the claim" and dismissing wiretap claims on that basis); *Javier v. Assurance IQ, LLC*, No. 4:20-CV-02860-JSW, 2021 WL 940319, at *2 (N.D. Cal. Mar. 9, 2021) (explaining that "consent generally defeats privacy claims" and granting motion to dismiss);

---

[4] On information and belief, Plaintiff alleges that there are over 11,000 apps with the Segment SDK installed. Compl. ¶ 15. He does not identify any such app other than the Calm App.

1  *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) (same). And in

2  granting such motions, courts regularly take judicial notice of terms of service and privacy

3  policies. *See, e.g., Garcia*, 78 F. Supp. 3d at 1136 (taking notice of an online privacy policy,

4  reasoning that "[alt]hough Plaintiff denies having conferred his consent, the Court need not

5  accept as true any allegations contradicted by matters properly subject to judicial notice or by

6  exhibit") (internal citations omitted).

7      Consent may be express, or it may be implied through continued use of a product or

   service despite disclosure of the complained of practices. *See Smith*, 745 F. App'x at 9

8  ("Knowing authorization of the practice constitutes Plaintiffs' consent[.]"). As a result, "[c]ourts

9  consistently hold that terms of service and privacy policies . . . can establish consent to the

10  alleged conduct challenged under various states' wiretapping statutes and related claims." *Silver*,

11  2021 WL 3191752, at *4 (internal citations omitted).

12      Here, Plaintiff alleges that he "downloaded and used the Calm meditation app on his

13  Android device within the last year[.]" Compl. ¶ 30. As the incorporated and judicially noticeable

14  materials establish, that allegation means that he navigated to the Calm App User Interface on the

15  Google Play Store, which includes explicit disclosures regarding Calm's data collection and

16  sharing practices before he ever even downloaded the app. *See* Heim Decl. ¶ 2, Ex. A. Moreover,

17  once he downloaded and opened the app on his device, he was met with the Calm App's Log-in

18  Page, which advised him: "By tapping Continue or logging into an existing Calm account," he

19  "acknowledge[d] that [he had] read our Privacy Policy." *Id.*, ¶ 3, Ex. B. He would have received

    the same message every time he logged into the app. *Id.* ¶ 3.

20      The Calm Privacy Policy that Plaintiff agreed to disclosed the data practices that Plaintiff

21  complains of, *i.e.*, that the Calm App, collected and shared his in-app activity with its service

22  providers, like Twilio. Compl. ¶¶ 43, 52, 59, 60-61. The Calm Privacy Policy informs users that

23  the app collects end users' "app activity," including but not limited to personal details, usage

24  information, transaction information, log information, device information, and communications.

25  Heim Decl., Exs A, C. The Calm Privacy Policy explains that it may disclose the information it

26  collects about users "[w]ith companies and contractors that perform services for us" including

1

"analytics providers, advertising partners, and other service providers" and further specifies that it

2

allows "contractors" to use online "technologies" to "collect information about your use of the

3

Services and other websites and online services[.]" *Id.*, Ex. C ("Disclosures of Information" and

4

"Advertising and Analytics Services Provided by Others").

5

Because these disclosures cover the alleged data practices at issue, Plaintiff's claims

6

should be dismissed with prejudice. *See, e.g.*, *Smith*, 745 F. App'x at 9; *Silver*, 2021 WL

7

3191752, at *5; *Hammerling,* 2024 WL 937247, at *3; *Garcia*, 78 F. Supp. 3d at 1136 (N.D. Cal.

2015); *see also In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020).

8

9

**B.    Plaintiff's claims fail because Twilio required Calm to disclose its data practices and thus never knowingly and intentionally invaded Plaintiff's privacy.**

10

Plaintiff's claims require Plaintiff to prove that Twilio knowingly and intentionally

11

obtained his data without authorization and used it for an improper purpose. *See Doe I*, 2024 WL

12

3490744, at *6 ("CIPA liability only extends to willful or intentional conduct."); *United States v.*

13

*Christensen*, 828 F.3d 763, 790 (9th Cir. 2015) (same for Federal Wiretap Act and noting that

14

CDAFA "requires <u>knowing</u> access") (emphasis in original). In the context of third-party software

15

cases like this one, even actual "awareness that [unauthorized] information is likely being

16

transmitted" does not satisfy those strict standards and "is not the right way to think about intent."

17

*See Doe I*, 2024 WL 3490744, at *3.  This is because criminal statutes require "guilty

18

knowledge," and this *mens rea* requirement must be satisfied as to each element. *Stark v. Super.*

19

*Ct.*, 52 Cal. 4th 368, 393 (2011) ("[C]riminal statutes [] include a guilty knowledge

20

requirement."); *Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) (a criminal statute's

21

*mens rea* requirement is generally applied to each element). And where a service provider, such

22

as Twilio, has required its contractual counterparty to obtain the requisite permissions from its

23

users before sharing their data, it cannot have the requisite knowledge and intent necessary for a

violation of these criminal statutes. *Doe I*, 2024 WL 3490744, at *5.

24

Plaintiff has not pleaded, and cannot plead, that Twilio knowingly and intentionally

25

invaded his privacy. To the contrary, as part of Twilio's publicly available DPA (which is

26

incorporated as part of Twilio's contract with Calm), Twilio requires that Calm warrant that it

12

"has provided and will continue to provide adequate notices, and that it has obtained and will continue to obtain the necessary permissions and consents, to provide Customer Data to Twilio for processing[.]" Heim Decl, Ex. G ¶ 5.3; *see also* Ex. H (DPA) ¶ 4. Plaintiff has not alleged any well-pleaded facts to suggest Twilio intended for Calm to disregard this contractual requirement to obtain all requisite permissions and consents before providing data to Twilio to process or that Twilio had any knowledge that this has occurred (which, of course, it has not).

In this respect, the facts here are similar to the facts set out in another district court's recent order dismissing a third-party pixel case against Google. *See Doe I*, 2024 WL 3490744, at *4-*5. Google, the third-party software provider there, specifically instructed website operators using its source code on their sites to not share any health information with it. *Id.* Google thus lacked the requisite intent to violate the CIPA, the California Constitution, or common law. *Id.* at *4. The same principle applies here. "There is nothing inherently unlawful about [Twilio] offering its source code" to service providers—"at least given [Twilio's] admonitions" to its clients that they must supply all necessary disclosures, secure all prior consent, and comply with applicable laws. *See id.*; *see also Spy Dialer, Inc. v. Reya LLC*, No. ED-CV-181178-FMO-SHKx, 2018 WL 3689554, at *1 (C.D. Cal. July 26, 2018) (allegations that the defendant gave "permission to third party advertising platforms to place advertisements on its website" was insufficient to plead either knowledge for CDAFA or intent for federal analogue). Because Twilio did not knowingly and intentionally receive unauthorized personal information, Plaintiff cannot plead the requisite intent to support any of his claims.

### C. Plaintiff's CIPA claim should be dismissed because the party exception applies, and Plaintiff otherwise fails to plead the elements.

Plaintiff's CIPA claim is brought under Section 631 of the California Penal Code, which contains three clauses prohibiting different forms of direct conduct: (1) intentional wiretapping, (2) willfully and without the consent of all parties to the communication, attempting to learn the contents or meaning of a communication in transit over a wire, and (3) attempting to use or communicate information obtained as a result of engaging in either of the two previous activities. *Turner v. Nuance Commc'ns, Inc.*, No. 22-CV-05827-DMR, 2024 WL 2750017, at *4

1   (N.D. Cal. May 28, 2024). Plaintiff does not state which clause or clauses his claim is based on.

2   But Twilio is exempt from all three clauses under the "party exception." Moreover, intentional

3   wiretapping applies only to telephonic communications; eavesdropping requires well-pleaded

4   allegations of real-time interception; and the third clause is derivative and fails because Plaintiff

5   cannot plead "use."

6           **1.      Twilio is exempt from Section 631 under the "party exception" rule.**

7           A party cannot wiretap or intercept its own communications under Section 631. *Williams*

8   *v. DDRMedia, LLC*, 2023 WL 5352896, at *4 (N.D. Cal. Aug. 18, 2023) (citing *In re Facebook,*

9   *Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020)); *Rogers v. Ulrich*, 52 Cal. App.

10  3d 894, 899 (1975)). Thus, as a number of courts in this District have held, a third-party service

11  provider who provides software to a website (or mobile app) operator to record its end users'

12  interactions with its website is not wiretapping or intercepting those communications; they are

13  merely "an extension of" the website or application operator using their software. *See Williams*,

14  2023 WL 5352896, at *4 (collecting cases). Some courts have held that a software vendor may

15  fall outside of the party exception if the Plaintiff has stated facts indicating that the relevant

16  software provider has the "capability to use its record of the interaction" for its own purposes.

17  *Cody*, 2024 WL 735667, at *6.

18          To try to avoid the exception, Plaintiff alleges baldly that "Defendant did not act as a mere

19  extension of the [Calm App] because it used the intercepted communications for its own

20  purposes" to "correlate data across various mobile apps to create a unified customer profile" and

21  "make various behavioral predictions about Plaintiff." Compl. ¶ 60. This conclusory allegation is

22  unsupported by any well-pleaded facts in Plaintiff's complaint and instead rests on twisting and

23  mischaracterizing language from the generic product descriptions on Twilio's website related to

24  Twilio's Unify and Engage products, which Calm did not even use. *See* Compl. ¶¶ 26-29

25  (partially citing, although not attaching, fragments of Twilio's website); *see also* Heim Decl.,

26  Exs. J-U.

            But the generic product descriptions this allegation is predicated upon "do not support this

    assumption; indeed, they appear to contradict it." *See Doe I*, 2024 WL 3490744, at *2. None of

those materials say—or even insinuate—that Twilio can use or share its clients' first-party data for its own purposes. To the contrary, the generic product descriptions that are incorporated into the Complaint explain that Unify and Engage, when enabled, may allow an ***individual Twilio client*** to process its ***own first-party data*** by helping the client: (a) create "unified customer profiles" of the client's end users, where the client interacts with its end-users through multiple platforms (*i.e.*, that client's mobile app and website); perform "identity resolution" of the client's end users based on the client's own data, where the client interacts with its end users via multiple devices (*i.e.*, a phone and laptop);[5] make guesses about the client's end-users interests to inform the client's marketing; and configure the client's own code so ***the client*** can share ***its*** first-party data with the client's specifically designated partners. *Compare* Compl. ¶¶ 25-29 (quoting Twilio webpages discussing these features) *with* Heim Decl., Exs. J-O (Twilio webpages). In other words, the Unify and Engage products do not enable ***Twilio*** to "correlate data across various mobile apps to create a unified customer profile" and "make various behavioral predictions about Plaintiff," Compl. ¶ 60; rather, these products merely allow Twilio's clients to process their own data. *See* Heim Decl., Ex. J.

Plaintiff does not allege a single, non-conclusory fact that would allow the Court to otherwise infer that Twilio has the ability to use Calm's first-party data for its own purposes. To the contrary, Twilio's product and security descriptions make clear that Twilio specifically designs its products to avoid cross contamination of different clients' end-user data. *See* Heim Decl., Ex. I (publicly available Security Overview) ("Twilio APIs are designed and built to . . . prevent other customers from having access to Customer Data."). And of course, Twilio is contractually barred from using or divulging the data for its own purposes. *Id.*, Ex. H (DPA) ¶¶ 4-5. Plaintiff also does not explain how, given that Twilio's clients individually decide how to configure the SDK (and what to collect), Twilio could as a practical matter combine and/or correlate the various nonstandard datasets its clients independently generate.

---

[5] Since Plaintiff only alleges that he used the Calm application on his Android device, it is additionally unclear how these features even apply to him given he has only interacted with Calm via a single channel, so there are no profiles to merge or identities to resolve in his case.

In any event, Plaintiff does not even allege that Calm purchased or utilized either the Unify or Engage product. He merely assumes those products are used because Twilio discusses them on its website. This is insufficient. *See, e.g., Doe I*, 2024 WL 3490744, at *3 (dismissing CIPA claim where plaintiffs were "assuming that particular features of Google's products are being enabled on [third-party web] pages, based simply on the fact that those features happen to be described in Google's generic product descriptions."). And, in fact, Calm has not purchased those features from Twilio. *Id*., Ex. F (Order Form).

In sum, there are no well-pleaded allegations that Twilio has used or shared Calm's end-user data (let alone Plaintiff's data) for its own purposes, or even that it is capable of doing so. The party exception, therefore, applies with full force to Plaintiff's Section 631 claim. *See Yockey v. Salesforce, Inc.*, 688 F. Supp. 3d 962, 973 (N.D. Cal. 2023) (allegations that communications conducted on a Kaiser website were "routed through a Salesforce server," that Salesforce "directly receives the electronic communications of visitors" and "can view transcripts in real time" did not support a reasonable inference that Salesforce has the capability to use those communications); *Cody*, 2024 WL 735667, at *6 (similar); *Rodriguez v. Ford Motor Co.*, No. 3:23-cv-000598-RBM, 2024 WL 1223485, at *13 (S.D. Cal. Mar. 21, 2024) (similar).

### 2. Plaintiff cannot state a wiretapping claim under the first clause of Section 631 as it does not apply to internet communications.

Plaintiff appears to assert an intentional wiretapping claim under the first clause of Section 631. *See* Compl. ¶ 57 (alleging that Twilio made an "unauthorized connection" to Plaintiff's "mobile device[]"). This claim fails as a matter of law. As this Court has held, "[c]lause one of Section 631(a) prohibits telephonic wiretapping, which does not apply to the internet," even where one accesses the internet through a smart phone. *See Cody*, 2024 WL 735667, at *3 (concluding clause one of Section 631(a) did not support claims where the plaintiff alleged "that she used the web browser on a smart phone to access Ring's website"); *Valenzuela v. Keurig Green Mountain, Inc*., 674 F. Supp. 3d 751, 755 (N.D. Cal. 2023) (same); *In re Google Assistant*, 457 F. Supp. 3d at 825 (same); *Swart*s, 689 F. Supp. 3d at 743 (same).

1

2

   **3. Plaintiff has failed to state a claim under the second clause of Section 631 because he does not adequately allege that Twilio intercepted the contents of his communications while in transit.**

3

  To the extent that Plaintiff asserts a claim under the second clause of Section 631(a) for

4

"intercepting" the contents of his communications with Calm, that claim fails because Plaintiff

5

has not adequately alleged that Twilio "intercepted" the "contents" of his communications "while

6

"in transit" between his device and the Calm App or that Twilio "learned" such contents. *See* Cal.

7

Pen. Code § 631(a). Indeed, Plaintiff's clause two claim is deficient as to each of these elements.

8

  ***Interception:*** Plaintiff's conclusory assertion that Twilio "intercepts" his communications

9

is insufficient as he fails "to explain how the software works or how the interception occurs."

10

*Cody*, 2024 WL 735667, at *5 (concluding the plaintiff insufficiently pled "interception" where

the plaintiff merely alleged that "the third-party software is 'plugged into' Ring's website").

11

Plaintiff broadly proclaims that Calm (and thousands of other mobile apps) have "embedded

12

Twilio's Segment SDK into their mobile apps allowing them to siphon data[.]" Compl. ¶ 2. But,

13

by the Complaint's own definition, an SDK is a "collection" of tools and can be configured

14

according to the developer's specific needs. *See id*. In other words, an "SDK" is not a specific

15

technology that works in a singular way. So, the mere fact that a mobile app may have aspects of

16

an SDK embedded (*i.e.*, certain pieces of code) does not on its own allow any inferences

17

regarding how, when, or whether data is being collected. Interception is therefore insufficiently

18

pled. *See Quigley v. Yelp, Inc*., No. 17-CV-03771-RS, 2018 WL 7204066, at *4 (N.D. Cal. Jan.

19

22, 2018) (plaintiff failed to plead interception where he did not allege "how or when any

20

defendant became aware of his communications").

21

  ***In-transit:*** The failure to describe how the technology works is made even more

22

problematic by the lack of details regarding *when* the alleged interception occurs. Under Section

23

631, an alleged eavesdropper must listen to a communication "*while* the same is in transit[.]"

24

*Cody*, 2024 WL 735667, at *5 (emphasis in original) (quoting Cal. Pen. Code § 631(a)). The

"allegations must demonstrate a party intercepted the communication during its transmission,

25

rather than once it was placed in electronic storage." *Heiting*, 2024 WL 1626114, at *8 (citing

26

*Konop v. Hawaiian Airlines, Inc*., 302 F.3d 868, 876–77 (9th Cir. 2002)). But here there are ***no***

allegations (let alone well-pleaded allegations) that Plaintiff's communications were intercepted while "in transit." At most, Plaintiff alleges (in connection with a different claim) that the Segment SDK is designed "to contemporaneously" collect In-App Activity. Compl. ¶ 43. But that allegation is devoid of any factual support and directly contradicts other allegations stating that the data is collected directly from Plaintiff's device. *See id*. ¶ 58 ("Defendant's Segment SDK made an unauthorized connection with Plaintiff's . . . device[]"); *see id*. ¶ 52 (in support of CDAFA claim claiming that Twilio "accessed" his mobile device to obtain his data). "Using the word 'intercept' repeatedly is simply not enough without the addition of specific facts that make it plausible [that Twilio] is intercepting their data in transit." *Rodriguez v. Google LLC*, No. 20-CV-04688-RS, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022) (concluding that adding the word "simultaneously" to previously dismissed complaint did not cure CIPA deficiency).

**Contents:** Plaintiff likewise fails to adequately allege that Twilio has learned the "contents" of his communications with Twilio. "Contents" of a communication refer to "any information concerning the substance, purport, or meaning of that communication." *Hammerling*, 615 F. Supp. 3d at 1092 (citing 18 U.S.C. § 2510 and noting that the analysis under the Federal and California wiretap acts "is the same"). The Ninth Circuit has further clarified that "contents" means "the intended message conveyed by the communication" as opposed to "record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Privacy Litigation*, 750 F.3d 1098, 1106 (9th Cir. 2014).

Plaintiff inconsistently identifies what "communications" form the basis of his claims, but for purposes of his CIPA claim he appears to allege that his "search terms, keystrokes, page views, button presses, and other choices on their mobile devices, including their affirmative actions (such as installing a mobile app on their device)" are the relevant "communications" allegedly intercepted by Twilio. Compl. ¶ 57. But these data points are "record information," including identity or device information, keystrokes, button presses, or app installations, as they are all incidental to Plaintiff's communications, not the "contents" thereof. *See Hammerling*, 615 F. Supp. 3d at 1093 (concluding data about the apps used by consumers was not "contents" because such information "only allows Google to make 'educated guesses' about a user's traits

and habits"); *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1082 (C.D. Cal. 2021) (holding that "keystrokes, mouse clicks, pages viewed, and shipping and billing information" were not contents).[6]

**Read or Learn:** Finally, there are no well-pleaded allegations that Twilio ever "reads, attempts to read, or to learn" the content of Plaintiff's communications. Rather, Plaintiff's own allegations describe Twilio as a "pipeline," which implies passive participation. *See* Compl. ¶ 13. Accordingly, Plaintiff offers "no coherent story of how or why" a service provider would learn granular information about its clients' end users given that information has "nothing to do with its alleged service or stated uses of consumer data." *See Love, Inc.*, 2024 WL 2104497, at *2.

### 4.    Plaintiff cannot state a claim under the third clause of Section 631 because it is derivative and fails for the same reasons.

If Plaintiff also asserts a "use" claim under the third clause of Section 631(a), it is derivative of his other CIPA claims, and fails for the same reasons. *See Google Assistant*, 457 F. Supp. 3d at 827. And, as explained, Plaintiff insufficiently alleges that Twilio can or does use Plaintiff's data, so the claim fails for that reason as well. *See Love*, 2024 WL 2104497, at *2.

### D.    Plaintiff's Federal Wiretap Act claim fails as a matter of law because that Act is a one-party consent statute and Calm consented to the collection.

The consent of one party is a complete defense to liability under the Federal Wiretap Act. 18 U.S.C. § 2511(2)(d) (not unlawful to intercept a "communication" where "one of the parties to the communication has given prior consent"); *see also Pyankovska*, 65 F.4th at 1074 (noting that the Act is a one-party consent statute). Here, Plaintiff alleges that the "developers of the Calm mobile app embedded the Segment SDK into its mobile app allowing Defendant to intercept

---

[6] Plaintiff may argue that "search terms" should be considered "contents." But he does not adequately allege that such collection was enabled in Calm, nor does he allege that he searched any terms in the Calm App or that he was targeted with an ad connected with such a search term. Instead, he relies solely on the fact that Calm embeds the Segment SDK and asks the Court to infer the rest. The Court should decline to do so. *See Doe I*, 2024 WL 3490744, at *3 (noting that the plaintiff's allegations were "indefinite" and "hypothetical" where there was no allegation "that any plaintiff [] ever saw any targeted advertisements related to their health at all"); *Augustine v. Great Wolf Resorts, Inc.*, No. 23-CV-00281-DMS-DTF, 2024 WL 3450967, at *6 (S.D. Cal. July 18, 2024) (concluding allegations that the defendant intercepted "mouse movements and clicks, keystrokes, [and] search terms" were insufficient especially since the plaintiff did not even allege that "she placed an order").

19

communications between Plaintiff and Calm[.]" Compl. ¶ 31. Accordingly, because Plaintiff concedes that Calm consented to the interception by affirmatively embedding the Segment SDK in its code, and Calm is a party to the intercepted communication, the Federal Wiretapping claim should be dismissed without leave to amend. *See, e.g.*, *Roe*, 2024 WL 2873482, at *6 (concluding the plaintiff's federal wiretapping claim was "barred pursuant to the one-party consent provision" where the defendant, "as the creator and operator of its website, consented to the use of data collection tools it installed on its website.); *see also* Heim Decl., Ex. F (Executed Order Form).

Moreover, Plaintiff fails to adequately plead the other elements of a Federal Wiretap Act claim for all of the same reasons discussed for the Section 631 claim under CIPA. *See Konop*, 302 F.3d at 878 (noting that the Federal Wiretap Act requires interception to occur during "transmission"); *see also In re Facebook,.*, 956 F.3d at 607 ("Courts perform the same analysis for both the Wiretap Act and CIPA regarding the party exemption.").

### E.   Plaintiff fails to state a CDAFA claim because he insufficiently pleads the requisite acts, access, and damages.

CDAFA, an anti-hacking criminal statute, prohibits several distinct "acts" that create liability. Plaintiff brings his CDAFA claim under three subsections, which respectively penalize any person who: "[k]nowingly accesses and without permission" "uses any data, computer, computer system, or computer network in order to" "wrongfully control or obtain money, property, or data;" "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer[;]" and "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." Cal. Pen. Code § 502(c)(1), (c)(2), (c)(7). In addition to the fact that the collection is **with users' permission**, as described above, this claim fails for multiple reasons.

*Acts*: The Complaint is deficient because it relies on the same set of facts to support three different subsections of Section 502 even though those subsections prohibit different conduct. Compl. ¶ 51. This shotgun-type pleading fails to put Twilio on fair notice of what conduct is at issue given "[l]iability under Section 502(c) turns on an analysis of the specific 'acts' that are alleged to constitute an offense[.]" *Bui-Ford v. Tesla, Inc.,* No. 4:23-CV-02321, 2024 WL

694485, at *5 (N.D. Cal. Feb. 20, 2024); *cf. In re Ethereummax Inv.*, No. CV 22-00163-MWF-SKX, 2023 WL 6787827, at *15 (C.D. Cal. June 6, 2023) (dismissing claim as a shotgun pleading where the plaintiff contended that the defendants were "liable under four different subsections of 25400(b)-(e), without differentiating among the sections").

**Access**: Moreover, each of the subsections require Plaintiff to adequately allege that Twilio "accessed" Plaintiff's device, but the Complaint's single conclusory allegation concerning "access" does nothing more than restate the pleading requirements. Compl. ¶ 52. The Complaint lacks any well-pleaded factual allegation to support its contention that Twilio in fact "accessed" Plaintiff's mobile device. Plaintiff's CDAFA claim therefore should be dismissed as insufficiently pleaded. *See, e.g.*, *Heiting*, 709 F. Supp. 3d at 1020; *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1260–62 (N.D. Cal. 2022) (holding the collection and logging of data from users by a third party during their "normal use" of Meta's website was insufficient to establish "access" for purposes of CDAFA)). This deficiency is particularly problematic because Plaintiff's wiretap claims depend on the inherently contradictory allegation that Twilio intercepts Plaintiff's communications while they are "in transit" as opposed to "accessing" them from Plaintiff's device. *See* Compl. ¶ 43.

Moreover, the Section 502(c)(7) claim fails because Plaintiff does not allege that Twilio circumvented technical barriers to "access" his mobile device. That subsection encompasses one of the main objectives of the statute, *i.e.*, hacking, as it criminalizes those who "without permission access" a computer, as such, courts have recognized, that subsection requires a plaintiff to plead more than lack of consent. *See* Cal. Pen. Code § 502(c)(7). *See Bui-Ford*, 2024 WL 694485, at *5 (holding a plaintiff must plead circumvention of technical barriers for subsections of CDAFA that require access to the computer be "without permission").

**Damages**: Finally, Plaintiff lacks statutory standing to bring his CDAFA claim because his sole allegation concerning injury is that Twilio was "unjustly enriched with the data it obtained from Plaintiff." Compl. ¶ 53. But to bring a private civil cause of action under Section 502, a plaintiff must plead that he "suffers damage or loss" due to the criminal violation. Cal. Penal Code § 502(e). The "majority of courts to consider the issue," have found "that the

CDAFA's private right of action contemplates some damage **to the computer system, network, program, or data** contained on that computer, as opposed to data generated by a plaintiff while engaging with a defendant's website." *Heiting*, 2023 WL 9319049, at *7 (emphasis added) (citing Cal. Penal Code § 502(e)(1)); *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 488 (N.D. Cal. 2021) (dismissing CDAFA claim because the"[p]laintiffs offer no support for their theories that the loss of the right to control their own data, the loss of the value of their data, and the loss of the right to protection of the data" is "damage or loss' within the meaning of the CDAFA"); *Pratt v. Higgins,* No. 22-CV-04228-HSG, 2023 WL 4564551, at *9 (N.D. Cal. July 17, 2023) (same).

Moreover, even if unjust enrichment could be considered a proper damages theory under CDAFA, Plaintiff fails to support it with any well-pleaded facts. To the contrary, Twilio's own contracts prohibit it from selling data collected by Calm or from otherwise profiting off of Plaintiff's data. Heim Decl., Ex. G ¶ 4.2 (Twilio Platform Agreement); Ex. H (DPA) ¶¶ 4-5. Therefore, Plaintiff does not, and cannot, plead that Twilio was unjustly enriched at Plaintiff's expense. *See Roe*, 2024 WL 2873482, at *7 ("Plaintiffs do not allege that Defendant sold their data and do not plead other facts supporting the assertion that Defendant was unjustly enriched."); *cf. Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51, 57 (1996) ("Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched **at the expense of another**.") (emphasis added). As such, Plaintiff lacks standing and the CDAFA claim should be dismissed.

## IV.    CONCLUSION

Twilio respectfully requests that the Court dismiss this entire action with prejudice, as any amendment would be futile.

Dated:  October 18, 2024

KEKER, VAN NEST & PETERS LLP

By:    /s/ *Benjamin Berkowitz*
BENJAMIN BERKOWITZ
MATAN SHACHAM
JACQUELINE CONCILLA
NATALIE R. HEIM

Attorneys for Defendant TWILIO INC.