Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Jared Lucky (SBN 354413)
jlucky@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Schuyler Ufkes*
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought

Counsel for Plaintiff and the Putative Class

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH BENDER, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>TWILIO INC., a Delaware Corporation,<br><br>*Defendant*. | Case No. 3:24-cv-04914-AMO<br><br>Hon. Araceli Martínez-Olguín<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL ARBITRATION**<br><br>Date:<br>Time:<br>Room: |

1

## TABLE OF CONTENTS

2

INTRODUCTION ..................................................................................................... 1

3

BACKGROUND ....................................................................................................... 2

4

ARGUMENT ............................................................................................................ 4

5

   I.     PLAINTIFF DID NOT ASSENT TO THE CALM TERMS OF SERVICE ................. 5

6

   II.    EVEN IF PLAINTIFF ASSENTED TO CALM'S TERMS, TWILIO—A NON-
7         SIGNATORY TO THOSE TERMS—CANNOT ENFORCE THEM ............................ 9

8         A.  Calm's Terms of Service—including its arbitration clause—are expressly
            limited to signatories ............................................................................... 9

9

10         B.  Equitable estoppel does not apply ......................................................... 10

11             1.  Twilio fails to establish the four elements of
               equitable estoppel ............................................................................. 10

12

13             2.  Twilio's arbitration-specific version of equitable
               estoppel is improper ......................................................................... 12

14

15             3.  Twilio fails to satisfy even its own improper
               arbitration-specific test ..................................................................... 17

16

CONCLUSION ....................................................................................................... 20

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**United States Supreme Court Cases**

*Arthur Anderson LLP v. Carlisle,*
   556 U.S. 624 (2009) ....................................................................................... 13

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark,*
   581 U.S. 246 (2017) ....................................................................................... 15

*Morgan v. Sundance,*
   596 U.S. 411 (2022) ....................................................................................... 15

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
   388 U.S. 395 (1967) ......................................................................................... 2

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,*
   363 U.S. 574 (1960) ......................................................................................... 5

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.,*
   489 U.S. 468 (1989) ......................................................................................... 5

**United States Circuit Court Cases**

*Berman v. Freedom Fin. Network, LLC,*
   30 F.4th 849 (9th Cir. 2022) ........................................................................ 7, 8

*Britton v. Co-op Banking Grp.,*
   4 F.3d 742 (9th Cir. 1993) ............................................................................... 9

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.,*
   207 F.3d 1126 (9th Cir. 2000) ......................................................................... 5

*Franklin v. Cmty. Reg'l Med. Ctr.,*
   998 F.3d 867 (9th Cir. 2021) .................................................................... 12, 16

*Herrera v. Cathay Pac. Airways Ltd.,*
   104 F. 4th 707 (9th Cir. 2024) ....................................................................... 12

*Homedics, Inc. v. Valley Forge Ins. Co.,*
   315 F.3d 1135 (9th Cir. 2003) ......................................................................... 5

*In re Pac. Fertility Ctr. Litig.,*
   814 F. App'x 206 (9th Cir. 2020) ................................................................... 12

*Khoja v. Orexigen Therapeutics, Inc.,*
   899 F.3d 988 (9th Cir. 2018) ......................................................................... 18

*Knutson v. Sirius XM Radio Inc.*,
  771 F.3d 559 (9th Cir. 2014) ............................................................................. 5, 6

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) ....................................................................... 5, 9, 12

*Lee v. Intelius Inc.*,
  737 F.3d 1254 (9th Cir. 2013) ................................................................................. 6

*Medeiros v. City of Palo Alto*,
  851 F. App'x 98 (9th Cir. 2021) ............................................................................ 14

*MS Dealer Serv. Corp. v. Franklin*,
  177 F.3d 942 (11th Cir. 1999) ............................................................................... 13

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ................................................................................. 6

*Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*,
  10 F.3d 753 (11th Cir.1993) ................................................................................... 13

*United States v. Kirilyuk*,
  29 F.4th 1128 (9th Cir. 2022) ................................................................................ 17

**United States District Court Cases**

*Ackerberg v. Citicorp USA, Inc.*,
  898 F. Supp. 2d 1172 (N.D. Cal. 2012) ................................................................... 5

*Applebaum v. Lyft, Inc.*,
  263 F. Supp. 3d 454 (S.D.N.Y. 2017) .................................................................. 7, 8

*Colgate v. JUUL*,
  402 F. Supp. 3d 728 (N.D. Cal. 2019) ..................................................................... 8

*Maree v. Deutsche Lufthansa AG*,
  No. SACV 20-885-MWF, 2021 WL 267853 (C.D. Cal. Jan. 26, 2021) ..................... 7

**California Supreme Court Cases**

*Alameda Cnty. Deputy Sheriff's Ass'n v. Alameda Cnty. Employees' Ret. Ass'n*,
  9 Cal. 5th 1032 (2020) ..................................................................................... 11, 14

*City of Long Beach v. Mansell*,
  3 Cal. 3d 462 (1970) ............................................................................................ 11

*Hostler v. Hays*,
　3 Cal. 302 (1853) ........................................................................................ 15 n.4

*Quach v. Cal. Com. Club, Inc.*,
　16 Cal. 5th 562 (2024) .......................................................................................... 16

**Indiana Supreme Court Cases**

*Doe v. Carmel Operator, LLC*,
　160 N.E.3d 518 (Ind. 2021) .............................................................................. 13 n.3

**California Court of Appeals Cases**

*Adoption of S.S.*,
　72 Cal. App. 5th 607 (Cal. Ct. App. 2021) .............................................................. 11

*Davis v. Nissan*,
　100 Cal. App. 5th 825 (Cal. Ct. App. 2024) ................................................. 15, 16, 17

*Goldman v. KPMG, LLP*,
　173 Cal. App. 4th 209 (Cal. Ct. App. 2009) ................................................. 12, 13, 17

*Gorlach v. Sports Club Compay*,
　209 Cal. App. 4th 1497 (Cal. Ct. App. 2012) ......................................................... 14

*Jensen v. U-Haul Co. of California*,
　18 Cal. App. 5th 295  (Cal. Ct. App. 2017) ............................................................ 18

*Long v. Provide Com, Inc.*,
　245 Cal. App. 4th 855 (Cal. Ct. App. 2016) ............................................................. 9

*Metalclad Corp. v. Ventana Env't Organizational P'ship*,
　109 Cal. App. 4th 1705 (Cal. Ct. App. 2003) .................................................... 12, 13

*Orange Cnty. Water Dist. v. Assn. of Cal. Water etc. Authority*,
　54 Cal. App. 4th 772 (Cal. Ct. App. 1997) ............................................................ 15

*Pac. Fertility Cases*,
　85 Cal. App. 5th 887 (Cal. Ct. App. 2022) ...................................................... 16, 19

*Santa Clara Valley Water Dist. v. Century Indem. Co.*,
　89 Cal. App. 5th 1016 (Cal. Ct. App. 2023) .......................................................... 11

*Sellers v. JustAnswer LLC*,
　73 Cal. App. 5th 444 (Cal. Ct. App. 2021) ............................................................... 8

**Statutes**

9 U.S.C. § 1–16 ................................................................................................. 2

9 U.S.C. § 2 .................................................................................................... 15

**Miscellaneous**

Black's Law Dictionary (12th ed. 2024) ........................................................... 9

# INTRODUCTION

Defendant Twilio Inc. ("Defendant" or "Twilio") would have the Court force Plaintiff Noah Bender ("Plaintiff" or "Mr. Bender") into arbitration—not because of any agreement between Mr. Bender and Twilio, but because of an arbitration clause tucked away in the Terms of Service of Calm, a non-party mobile application used by Mr. Bender. Twilio paints itself as a hapless vendor being sued "tactically" by a plaintiff whose real beef is with Calm, and as result, argues that it should be shielded by Calm's arbitration terms. Hardly. Twilio is the alleged wrongdoer here—and it cannot meet its burden to show that Mr. Bender agreed to Calm's arbitration clause, much less that Twilio, a non-signatory to Calm's terms, is entitled to enforce it.

First, Plaintiff never agreed to Calm's Terms of Service. Under California law, Calm's Terms were too inconspicuous and ambiguous to put him on notice that, simply by logging into the app, he was assenting to a complex agreement limiting his rights to sue. For this reason alone, Twilio's motion should be denied.

Second, even if Plaintiff had formed an arbitration agreement with Calm, Twilio—a non-party to any such agreement—has no right to enforce it. The plain text of the Terms makes that clear. Defendant neglects to inform the Court that Calm's arbitration provisions are *expressly* limited to disputes between "you [the user] and Calm" and that the Terms "are intended solely for the benefit of the parties and are not intended to confer third-party beneficiary rights upon any other person or entity." (Dkt. 20-2 at 17.) Thus, even assuming that Mr. Bender agreed to arbitrate disputes *with Calm*, he certainly did not agree to arbitrate with anybody other than Calm.

Twilio's invocation of equitable estoppel does not provide a workaround. Twilio cannot satisfy the four traditional elements of equitable estoppel, which would require Twilio to show (among other things) that it relied on some conduct of Mr. Bender to its detriment. So instead, it

offers an arbitration-specific variant of the doctrine, which would permit a non-signatory to force arbitration of claims "intimately founded in and intertwined with" the underlying contract. But Twilio's version of equitable estoppel contravenes the clear instructions of the California Supreme Court and relies on a dubious chain of precedents. Moreover, it is precisely the type of arbitration-specific state law rule forbidden by the Federal Arbitration Act, 9 U.S.C. § 1–16 (the "FAA"), which makes "arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n. 12 (1967). And regardless, even under Twilio's version of equitable estoppel, it cannot enforce Calm's arbitration clause because Mr. Bender's claims are not intertwined with Calm's Terms of Service. Tellingly, Twilio argues that the Complaint is intertwined with Calm's *Privacy Policy*, a completely separate document from Calm's Terms of Service. Nor has Mr. Bender alleged that Calm and Twilio are joint wrongdoers. Even if Mr. Bender consented to Calm's collection of some personal information by using the Calm app, Twilio's surreptitious data collection is an entirely different (and unlawful) matter.

## BACKGROUND

Twilio is a data mining company that embeds its software into mobile applications to surreptitiously collect the personal data of millions of consumers. (Complaint ("Comp.") ¶¶ 1-2.) Mr. Bender used one of those apps, Calm. (*Id.* ¶¶ 30-31.) He alleges that Twilio accessed his device and collected his data without his knowledge or consent, in violation of federal and state wiretapping and computer privacy statutes. (*Id.* ¶¶ 5, 41-63.)

In response to Mr. Bender's Complaint, Twilio moved to compel arbitration on the basis of a provision contained in Calm's Terms of Service. (Dkt. 19.) Twilio attached a declaration from an employee of Calm, John Tien, which claims that when users first download and open the Calm app, they are presented with a "Welcome Page." (Dkt. 20, ¶¶ 8-9.) Text in white font at the top of the page invites users to "Create an account to save your progress." Beneath that text lie

three large white buttons with contrasting black font, providing three options for account creation ("Continue with Email," "Continue with Facebook," and "Continue with Google.") Below those buttons, at the bottom of the page in gray font smaller than the white text at the top of the page, appears the following statement: "[b]y tapping Continue or logging into an existing Calm account, you agree to our Terms and acknowledge that you have read our Privacy Policy, which explains how to opt out of offers and promos[.]" (*Id.*) The underlined terms are hyperlinked, but the link is only indicated by underlining—the linked words are the same size and color as the rest of the text in the sentence. (*Id.* ¶ 9.)

According to Mr. Tien's declaration, after selecting a button on the Welcome Page, users are directed to a similarly designed "Account Creation Page," with the same statement regarding Calm's Terms and Privacy Policy in small gray font at the bottom of the page. (*Id.* ¶ 12.) Finally, Mr. Tien states that every time users return to sign in to the app, they encounter a "Login Page." The Login Page also has a sentence of white text at the top of the page ("Log into your Calm account") above text fields into which the user can enter their email and password. (*Id.* ¶ 13.) Below the fields is a white line with "OR" in the middle, above three white buttons with black text offering alternative methods for signing in via Facebook, Google, and Apple. Beneath those buttons, and once again at the bottom of the page—in small gray font smaller than the white text at the top of the page—appears  the following statement: "By tapping Sign in or logging into an existing Calm account, you agree to our Terms and acknowledge that you have read our Privacy Policy, which explains how to opt out of offers and promos." Again, the hyperlinks to the Terms and Privacy Policy are only indicated with underlining. (*Id.*)

Mr. Tien explains that users can click the "Terms" hyperlink on the Welcome Page, Account Creation Page, and Login Page to view Calm's full Terms of Service.[1] (*Id.* ¶ 15.)

---

[1] The Tien Declaration states that an older version of Calm's Terms, attached to Twilio's Motion as Ex. C, were in effect until October 12, 2023. The current version, allegedly in effect since

1  Attached as Ex. B to Mr. Tien's declaration is what he states to be a copy of the current version

2  of Calm's Terms of Service. (*Id.*) The Terms of Service begin about half way down what Mr.

3  Tien describes as the "first screen" mobile users see after clicking the link to the Terms, under

4  the title "Calm Terms of Service." (Dkt. 20, ¶ 15 (showing the screen as it would appear on a

5  mobile device); see also Dkt. 20-2 (apparently reproduction the desktop version of the Terms).)

6  The three paragraphs above that title (i.e., before the Terms of Service start) refer the reader to

7  Calm's separate Privacy Policy; to Calm's Terms of Service for US and non-European users

8  (i.e., the Terms at issue here and found immediately under the title "Calm Terms of Service" on

9  Exhibit B to the Tien Declaration); and to Calm's separate Terms of Service for the European

10  Economic Area, Switzerland, and UK. (*Id.*) Notably, the Privacy Policy is not mentioned,

11  referred to, or incorporated anywhere in the Terms of Service. *See* Ex. B, *passim*.

12      The Calm Terms of Service contain an arbitration clause requiring "**YOU AND CALM**"

13  to arbitrate certain disputes and claims. (Dkt. 20-2 at 12–13) (emphasis in original). The Calm

14  Terms of Service also state that "**[b]y agreeing to these Terms,** *you and Calm* **will, as**

15  **described in section 16 below, be required to resolve most disputes** *with each other* **solely on**

16  **an individual basis through arbitration[.]**" (Dkt. 20-2 at 2) (bolding in original, italics added).

17  Finally, the Calm Terms of Use expressly state that they "are intended solely for the benefit of

18  the parties and are not intended to confer third-party beneficiary rights upon any other person or

19  entity." (Dkt. 20-2 at 17.)

20                                    **ARGUMENT**

21      Twilio's motion to compel arbitration should be denied. The often overstated "strong

22  presumption in favor of arbitration 'does not confer a right to compel arbitration of any dispute at

23  ───────────────

24  October 13, 2023 is attached to Twilio's Motion as Ex. B. Twilio produces no evidence specific
   to Mr. Bender to indicate when he last logged in, or which Terms he purportedly assented to. For

25  the sake of argument, this Response refers throughout to the current Terms, reproduced in Ex. B
   (which Twilio claims are "the same" for the purposes of determining the existence and

26  applicability of the arbitration provision). (Dkt. 19 at 4 n.3.)

27

28

any time.'" *Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172, 1175 (N.D. Cal. 2012) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989)). To the contrary, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). A defendant who is not a party to an arbitration agreement may enforce such an agreement against a signatory plaintiff only if the defendant can show that (1) "a valid agreement to arbitrate exists and . . . encompasses the dispute at issue," *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000), and (2) "the relevant state contract law allows the [non-signatory] litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013). Twilio fails on both fronts.

First, Plaintiff never formed an agreement to arbitrate with Calm. The Terms of Service were too inconspicuous to put him on notice that signing up for or logging into the Calm app would manifest his assent to those Terms. Second, even if Plaintiff agreed to the Calm Terms of Service, Twilio is not a signatory to those Terms and cannot enforce them. The Terms' plain language requires arbitration only of disputes between Mr. Bender and Calm, and it expressly disclaims any third-party rights. Nor does Twilio's invocation of equitable estoppel help it because it fails to satisfy the traditional elements of equitable estoppel, it improperly seeks to apply an arbitration-specific version of equitable estoppel, and it fails to satisfy even the elements of its preferred, arbitration-specific, version.

## I.    PLAINTIFF DID NOT ASSENT TO THE CALM TERMS OF SERVICE.

"State contract law controls whether the parties have agreed to arbitrate." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). Because no party has identified a meaningful conflict between California law and the law of another state, California law applies. *See Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1138 (9th Cir. 2003). "[U]nder

California law, mutual assent is a required element of contract formation." *Knutson*, 771 F.3d at 565. And though assent to an offer can be manifested by words or conduct, "[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id.* at 566. In addition, "[t]his principle of knowing consent applies with particular force to provisions for arbitration." *Id.* Thus, "[i]f a party wishes to bind in writing another to an agreement to arbitrate future disputes, such purpose should be accomplished in a way that each party to the arrangement will fully and clearly comprehend that the agreement to arbitrate exists and binds the parties thereto." *Id.* Applying these standards, Defendant has failed to establish that Mr. Bender assented to the Calm's Terms of Service, much less the arbitration agreement nested within those terms.

Defendant claims Mr. Bender manifested his assent to those terms by the tapping a button labeled "Continue with Email" on Calm's account creation pages and another button labeled "Log in" on Calm's Login Page. Under those buttons appeared fine print stating that "[b]y tapping Continue in or logging into an existing Calm account, you agree to our Terms and acknowledge that you have read our Privacy Policy, which explains how to opt out of offers and promos." (Dkt. 20, ¶ 10.) But "where a website specifically states that clicking means one thing, that click does not bind users to something else." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035-36 (7th Cir. 2016) (citing *Lee v. Intelius Inc.*, 737 F.3d 1254 (9th Cir. 2013)).

Here, the whole design of the account creation and login screens would lead a reasonable user to believe that tapping "Sign in" or "Continue" meant just that – creating an account or logging into an app, not assenting to a sweeping contractual agreement. All the relevant screens issue ostensibly straightforward instructions to the user at the top of the page, in white font, under the Calm logo: "Create an account to save your progress" or "Log into your Calm Account." Below those instructions, the screens are cluttered with text fields and large, high-

contrast buttons for signing up or logging in. Only at the very bottom of the screen, below all the buttons and fields, can a user find the language purporting to bind her to the hyperlinked Terms.

Numerous courts have held that consumers were not bound to terms of use simply because they clicked a button that had a different purpose. In *Maree v. Deutsche Lufthansa AG*, No. SACV 20-885-MWF, 2021 WL 267853, at *3-4 (C.D. Cal. Jan. 26, 2021), the court refused to compel arbitration based on terms of service an airline passenger had purportedly agreed to by clicking a button reading "**Complete Booking []**"—even though immediately *above* the button were the words "By selecting to complete this booking I acknowledge that I have read and accept the . . . Terms of Use . . . " And in *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017), the court refused to bind a user to online terms despite clicking a box agreeing to the terms, because "[t]he entire screen was structured as part of a process to verify a phone number, not to enter a detailed contractual agreement."

In fact, a Calm user might easily press one of the "Sign in" or "Continue" buttons before even reaching the fine print at the bottom. This would be especially likely on the Login Page, where a white line with "OR" written through it separates the email and password text field from two large buttons offering alternative means of logging in. An ordinary user, entering their login credentials in the top fields, might reasonably disregard any text that appeared beneath that "OR"—there would be no reason to investigate the alternative login methods at the bottom of the screen.

Even if the user were to scan all the way down to the fine print, it would be insufficient to put a reasonable consumer on notice of Calm's expansive terms. "[T]o be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022). Here, the language appears in gray font, smaller than the rest of the text of the page, with hyperlinks of the same color as the surrounding text.

California courts have held that contractual terms "in smaller print than any other print on the page" are inconspicuous and give inadequate notice. *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 481 (Cal. Ct. App. 2021); see also *Berman*, 30 F. 4th at 857 (noting that small font is inconspicuous where it is "considerably smaller than the font used in the surrounding website elements[]"). Similarly, hyperlinks that are underlined but "not set apart in any other way that may draw attention of the consumer, such as with blue text or capital letters[]" may fail to put a user on notice of the link to the full agreement. *Sellers*, 73 Cal. App. 5th at 481.

Even a notice stating explicitly that the user is assenting to terms of service by clicking a login button will not suffice if the hyperlink is inconspicuous. In *Applebaum*, the user clicked a box saying "I agree to Lyft's Terms of Service." 263 F. Supp. 3d at 458, 466-67. But the link to "Terms of Service," in the smallest font on the screen, failed to provide sufficient notice even though the link was colored in light blue on a white background. Similarly, in *Colgate v. JUUL Labs*, users encountered a login page with multiple text fields and large buttons for users to "Log In" or "Sign Up," with a notice in small text underneath stating that "By registering" the user was assenting to hyperlinked terms of service. 402 F. Supp. 3d 728, 764-66 (N.D. Cal. 2019). But the linked words (in light blue text on a white background) were not obviously "clickable," and thus failed to put users on notice of the terms. *Id*.

Here, Calm underlined the links to the Terms and Privacy Policy, but did not set them apart visually in any other way. The font size of the notice on the screen of a mobile device is miniscule, especially compared to the large text fields and buttons for users to log in. At bottom, the links here suffer from the same fatal defect pointed out in *Applebaum* and *JUUL*: they are too small and look too similar to the surrounding text, and as a result fail to put users on notice that they're assenting to separate terms on a separate webpage.

In assessing purported manifestations of assent, California law looks to "the reasonable meaning of [a consumer's] words and acts," and such words and acts "are to be judged with due

regard for the context in which they arise." *Long v. Provide Com, Inc.*, 245 Cal. App. 4th 855, 862 (Cal. Ct. App. 2016). In the context of Calm's account creation and login pages, the reasonable meaning of tapping the "Sign in" or "Continue" buttons is simply a user's intention to continue making an account or sign in. As in the cases discussed above, Mr. Bender did not *also* manifest his assent to Calm's Terms of Service by tapping those buttons, regardless of the fine print. And because Mr. Bender never manifested his assent to the Terms, no agreement to arbitrate was formed. For that reason alone, Defendant's motion should be denied.

## II.   EVEN IF PLAINTIFF ASSENTED TO CALM'S TERMS, TWILIO—A NON-SIGNATORY TO THOSE TERMS—CANNOT ENFORCE THEM.

Even assuming that Mr. Bender could be deemed to have assented to Calm's Terms of Service (and thus, to Calm's arbitration clause), Twilio—a non-signatory to those Terms—cannot enforce them. "Generally, the contractual right to compel arbitration 'may not be invoked by one who is not a party to the agreement and does not otherwise possess the right to compel arbitration.'" *Kramer*, 705 F.3d at 1126 (quoting *Britton v. Co-op Banking Grp.*, 4 F.3d 742, 744 (9th Cir. 1993)). Twilio was not a party or signatory to Calm's Terms of Service in any sense, nor is there any version of equitable estoppel that gives Twilio a right to enforce those Terms

### A.   Calm's Terms of Service—including its arbitration clause—are expressly limited to signatories.

Out of the gate, the Terms state that they "apply to the products and services of Calm.com, Inc. and our subsidiaries and affiliates ("Calm," "we," or "us")." (Dkt. 20-2 at 1.) Twilio is neither a subsidiary nor affiliate of Calm. A "subsidiary" is "[a] corporation in which a parent corporation has a controlling share," (*Corporation*, Black's Law Dictionary (12th ed. 2024) and an affiliate is "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, *Id.* Twilio makes no contention that it is related to Calm by shareholding or other means of control. Furthermore, the arbitration provisions—including those that Calm rendered in capital letters and

bold type—state again and again that the Terms bind "you [the user] and Calm" to arbitrate your disputes "with each other." *See, e.g.*, (Dkt. 20-2 ¶ 1) ("**By agreeing to these Terms, you and Calm will . . . be required to resolve most disputes with each other through arbitration** . . . ") (emphasis in original); (¶ 16 (stating that provision "**REQUIRES YOU AND CALM TO ARBITRATE**" (emphasis in original)). Indeed, the Terms describe arbitration as between "you and Calm" no fewer than eleven times. (*See* dkt. 20-2, ¶¶ 1, 16.) Finally—and if not clear enough already—Section 20(f) of Calm's Terms expressly declares that "these Terms are intended solely for the benefit of the parties *and are not intended to confer third-party beneficiary rights upon any other person or entity*." (Dkt. 20-2 at 17 (emphasis added)).[2] It's difficult to see how the Terms could have made it any clearer that only Calm and its users—not any third parties like Twilio—can enforce the Calm Terms (including the arbitration provision).

### B. Equitable estoppel does not apply.

To evade the plain language of the contract, Twilio invokes equitable estoppel. But equitable estoppel does not allow non-signatory Twilio to enforce the arbitration clause in the Calm Terms of Service because (1) the four elements of equitable estoppel are not present here, (2) Twilio's attempt to apply an arbitration-specific rule of equitable estoppel is improper, and (3) Twilio fails to satisfy even its improper arbitration-specific rule.

#### 1. Twilio fails to establish the four elements of equitable estoppel.

Under the traditional test repeatedly enunciated by the California Supreme Court, "four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the

---

[2] Defendant never mentions or cites Section 20(f), and it is particularly hard to find in Ex. B because the PDF of the Terms was not filed in text-searchable form as required by the Court's standing order. Moreover, per the Terms that currently appear on Calm's website, it appears the words "are intended" are obscured in Ex. B by a watermark in the footer. (Dkt. 20-2 at 17.)

other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *City of Long Beach v. Mansell,* 3 Cal. 3d 462, 488-89 (1970) (internal quotations omitted) (demonstrating that special emphasis on detrimental reliance in estoppel has been "long established in the judicial decisions of this state[]" since the nineteenth century); *see also Alameda Cnty. Deputy Sheriff's Ass'n v. Alameda Cnty. Employees' Ret. Ass'n,* 9 Cal. 5th 1032 (2020) (reciting and applying the same four-part test). The party asserting the equitable estoppel defense "bears the burden of proving its application." *Santa Clara Valley Water Dist. v. Century Indem. Co.*, 89 Cal. App. 5th 1016, 1052 (Cal. Ct. App. 2023).

Twilio cannot meet that burden here. At heart, equitable estoppel "is a rule of fundamental fairness whereby a party is precluded from benefiting from his inconsistent conduct which has induced reliance to the detriment of another." *Adoption of S.S.*, 72 Cal. App. 5th 607, 631 (Cal. Ct. App. 2021) (internal quotations omitted). To invoke the doctrine, Twilio must show that Mr. Bender, by his conduct, deliberately induced Twilio to rely on his acts or representations, and that Twilio relied on those acts or representations to its detriment. *Mansell,* 3 Cal. 3d at 489. But when Mr. Bender used the Calm app, he took no action suggesting that he had agreed to arbitrate any claims with Twilio—indeed, as detailed above, Mr. Bender never assented to Calm's terms, and even if he did, he would have had no reason to think his claims against a third-party like Twilio would be covered because third parties were explicitly excluded from the agreement. Mr. Bender did and said nothing that could have led Twilio to expect that it could arbitrate this dispute. As a result, Twilio cannot satisfy the first element (that Mr. Bender was "apprised of the facts"), the second element (that Mr. Bender intended to induce Twilio to rely on his conduct) or the fourth element (that Twilio relied on Mr. Bender's conduct to its detriment). Indeed, Twilio doesn't even attempt to establish these elements. There are no equitable grounds to compel arbitration here.

**2.    Twilio's arbitration-specific version of equitable estoppel is improper.**

Instead of applying this longstanding four-element approach, Defendant claims that "California's doctrine of equitable estoppel permits a non-signatory defendant to compel a signature plaintiff to arbitration: (1) 'when the claims against the nonsignatory are intimately founded in and intertwined with the underlying contract'; or (2) 'when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of the interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement.'" (Dkt. 19 at 9) (quoting *Herrera v. Cathay Pac. Airways Ltd*., 104 F. 4th at 707, 711(9th Cir. 2024)). It's true that some intermediate California appellate courts have employed this two-part, arbitration-specific rule of equitable estoppel. But that standard is wrong as a matter of law for two reasons. First it conflicts with the controlling standard laid down by the California Supreme Court, by erroneously applying federal law to an area where state substantive law governs. Second, it creates a contractual rule that singles out arbitration agreements for special treatment, in violation of the Federal Arbitration Act.

Defendant relies on the Ninth Circuit's decisions in *Herrera*, *Franklin*, *Kramer,* and *In re Pacific Fertility Center* for its account of California law. (Dkt. 19 at 3, 7, 9, 10, 12.) Each of those opinions derived a purportedly arbitration-specific California variant of equitable estoppel from *Metalclad Corp. v. Ventana Env't Organizational P'ship,* 109 Cal. App. 4th 1705 (Cal. Ct. App. 2003) and its progeny, especially *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209 (Cal. Ct. App. 2009). *See Kramer*, 705 F.3d at 1128-29 (citing *Metalclad* and *Goldman* for the rule); *Franklin v. Cmty. Reg'l Med. Ctr*., 998 F.3d 867, 870-71 (9th Cir. 2021) (deriving rule from *Metalclad* and quoting it at length); *Herrera*, 104 F.4th at 707 (deriving the California rule from *Franklin* and *Kramer'*s treatment of *Metalclad*),  *In re Pac. Fertility Ctr. Litig.*, 814 F. App'x 206, 209 (9th Cir. 2020) (same, and dubbing the two components of the arbitration-specific rule

the "*Goldman* scenario[s]").

But the *Metalclad* court was applying *federal* law, not creating or adapting equitable estoppel rules under California law. In an apparent "[i]ssue of [f]irst [i]mpression in California[,]" *Metalclad* expressly held that "federal law, not state law" controlled whether a non-signatory could enforce an arbitration agreement. *Metalclad Corp.*, 109 Cal. App. 4th at 1706, 1714 (emphasis omitted). To discern what federal standard would apply, the court looked far outside California to the Eleventh Circuit. *Id.* at 1716-17 (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999) and *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 756–757 (11th Cir.1993) (both abrogated by *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624 (2009)). In those cases, federal courts had permitted non-signatories to compel arbitration of claims "intimately founded in and intertwined" with the underlying contract, specifically to advance the "federal policy in favor of arbitration." *Metclad Corp.*, 109 Cal. App. 4th at 1712-13. The *Metalclad* court believed it was bound to apply this arbitration-friendly test as part of the "federal substantive law of arbitrability." *Id.* at 1713 (internal quotations omitted).

Six years later, however, the United States Supreme Court rejected that framework in *Arthur Anderson LLP v. Carlisle*, holding that the FAA did not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." 556 U.S. at 630-31. As Twilio admits, that includes state law regarding "estoppel." (Dkt. 19 at 9) (quoting *Arthur Anderson LLP*, 556 U.S. at 631). *Arthur Anderson LLP* thus clearly abrogated *Metalclad* and the line of appellate cases that trailed after it.[3] *See, e.g.*, *Goldman*, 173 Cal. App. 4th at 219 (wrongly applying "governing federal law").

In short, *Metalclad*—and cases in its wake, like *Goldman*—never changed the underlying California rule of equitable estoppel, which has retained its familiar elements and detrimental

---

[3] Cf. *Doe v. Carmel Operator, LLC*, 160 N.E.3d 518, 525-526 (Ind. 2021) (holding that *Arthur Anderson* "effectively abrogated any case that applied federal common law while ignoring state contract law[]" and rejecting arbitration-specific equitable estoppel under Indiana law).

reliance requirement. Although some intermediate state appellate courts have uncritically relied on *Metalclad* in the years since *Arthur Anderson LLP*, the California Supreme Court has never endorsed the arbitration-specific rule. On the contrary, that court's declaration that all four traditional elements "are basic to the general doctrine of equitable estoppel as it exists in this and other jurisdictions[]" remains good law. *Mansell,* 3 Cal. 3d 462 at 489. The California Supreme Court reiterated the four-part as recently as 2020, with the familiar guidance that "[e]quitable estoppel generally must be premised on some type of representation, ordinarily false, about a set of circumstances[]" on which the party invoking estoppel relied to its detriment. *Alameda Cnty.*, 9 Cal. 5th at 1072 (2020); *see also Medeiros v. City of Palo Alto*, 851 F. App'x 98 (9th Cir. 2021) (citing *Alameda County* and another decision applying the four-part test with approval, to establish requirements of California equitable estoppel).

In a testament to the vitality of the traditional test for equitable estoppel, intermediate appellate courts continue to apply it—even in the arbitration context. *Gorlach v. Sports Club Compay* is instructive. 209 Cal. App. 4th 1497 (Cal. Ct. App. 2012). There, *Gorlach* was presented with an arbitration agreement by her employer, Sports Club. She "led Sports Club executives to believe that she had signed the arbitration agreement, although she had not." *Id.* at 1501. After she quit and sued Sports Club, the company sought to compel her to arbitrate her claims on the basis of equitable estoppel. *Id.* The court recited and applied the traditional four-part test, and concluded that equitable estoppel did not apply, because "there was no evidence that Sports Club relied to its detriment on Gorlach's implied representations that she had signed the arbitration agreement[.]" *Id.* at 1506.

It would be bizarre for California law to require Sports Club—a signatory defendant who had been *lied to* by a non-signatory plaintiff—to show detrimental reliance, while waiving that requirement for a non-signatory like Twilio seeking to compel arbitration against a Plaintiff with clean hands. The rule Defendant contends for flies in the face of a bedrock principle of

California law: "The *sine qua non* of estoppel is that the party claiming it relied to its detriment on the conduct of the party to be estopped." *Id.* (quoting *Orange Cnty. Water Dist. v. Assn. of Cal. Water etc. Authority*, 54 Cal. App. 4th 772, 780 (Cal. Ct. App. 1997)). In interpreting California law, the Court should look to more than 150 years of state supreme court precedent affirming that principle,[4] not an aberrant line of lower court cases premised on a mistaken application of federal law.

Furthermore—and perhaps more importantly—Twilio's arbitration-specific rule conflicts with the Federal Arbitration Act. The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. In other words, the FAA "requires courts to place arbitration agreements on equal footing with all other contracts." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 248 (2017) (quotations omitted). To be sure, that means that "a court must hold a party to its arbitration contract just as the court would to any other kind." *Morgan v. Sundance*, 596 U.S. 411, 418 (2022). But as the Supreme Court recently emphasized in *Morgan*, the FAA also means that "a court may not devise novel rules to favor arbitration over litigation." *Id.* Here, Twilio asks this Court to do precisely that: ignore California's traditional principles of equitable estoppel (applicable to all contracts) in favor of a more generous equitable estoppel test applicable only to arbitration agreements. This "bespoke rule" singling out arbitration is incompatible with the FAA, *id.* at 417, and the Court should not apply it.

At least one California appellate court has recognized the tension between the FAA and the *Metalclad* line of cases. In *Davis v. Nissan*, the Fourth District California Court of Appeal applied the same two-part equitable estoppel test Twilio relies on here. 100 Cal. App. 5th 825, 843, 859 n.3 (Cal. Ct. App. 2024). The court, however, was troubled by the fact that in "the

---

[4] See, e.g., Hostler v. Hays, 3 Cal. 302, 306-307 (1853) ("The sense of estoppel is, that a man for the sake of good faith and fair dealing, ought to be estopped from saying that to be false, which . . . by his representations has led others to act.")

arbitration context, California courts have not applied the four traditional elements for equitable estoppel" long enunciated by the California Supreme Court, and noted that in "the absence of these traditional elements, including detrimental reliance, other jurisdictions have rejected such an arbitration-specific version of equitable estoppel." *Id.* (collecting authorities). *Davis* did not press further on the issue "because it [had] not been briefed by the parties," *id.* but the court correctly identified a serious problem: California intermediate appellate courts have effectively created a two-track system for equitable estoppel—one rule for arbitration agreements, and another for all other contracts. *See Pac. Fertility Cases*, 85 Cal. App. 5th 887, 893 (Cal. Ct. App. 2022) (noting distinction between "equitable estoppel generically" and equitable estoppel "in the context of arbitration.") (quotations omitted). This two-track system is contrary to *Morgan* and is not likely to be—indeed, cannot be, consistent with the FAA—endorsed by the California Supreme Court. *See*, *e.g.*, *Quach v. Cal. Com. Club, Inc.*, 16 Cal. 5th 562, 569 (2024) (abrogating prior arbitration-specific rule of California law after *Morgan*); *see also Franklin*, 998 F.3d at 871 (federal courts are obligated to follow intermediate state appellate courts on questions of state law unless there is convincing evidence that the state supreme court would decide differently).

Plaintiff recognizes that in *Herrera*, *Kramer*, *In re Pacific Fertility Center*, and *Franklin*, the Ninth Circuit applied the arbitration-specific version of equitable estoppel. But those decisions simply reflect a lack of consideration, not a reasoned prediction that the California Supreme Court would endorse such a rule. *Herrera*, *Kramer*, *In Re Pacific Fertility Center* and *Franklin* accepted the arbitration-specific version of equitable estoppel from *Metalclad* at face value, and, as in *Davis*, it does not appear that any of the parties in those cases raised the issue of that test's problematic origins and its departure from traditional principles of equitable estoppel. Nor did any of the four Ninth Circuit cases address the two-track system's incompatibility with the FAA. *Kramer, Franklin*, and *In Re Pacific Fertility Center* were decided before *Morgan*, and

so had no occasion to consider it. And though decided after *Morgan*, *Herrera* never cites it, and (so far as it can be discerned from the opinion) no party seems to have flagged the preemption issue for the Court. "Questions that merely lurk in the record, neither brought to [the] court's attention nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) (cleaned up) (holding that cases are "not precedential for propositions not considered, or for matters that are simply assumed[]").

Instead of the dubious arbitration-specific rule that Twilio relies on, this Court should apply the venerable (and generally applicable) rule of equitable estoppel prescribed by the California Supreme Court.

### 3.    Twilio fails to satisfy even its own improper arbitration-specific test.

Finally, even under Twilio's preferred, arbitration-specific rule, equitable estoppel would not be appropriate here. As for the first prong, Plaintiff's claims are not sufficiently "intertwined" with Calm's Terms of Service to permit Twilio to invoke estoppel. The "underlying principle" here is that Twilio must show that Plaintiff's claims are "founded in and inextricably bound up with *the obligations imposed by the agreement containing the arbitration clause.*" *Davis*, 100 Cal. App. 5th at 835 (quoting *Goldman*, 173 Cal. App. 4th at 219) (emphasis in *Davis*). The rationale of the arbitration-specific rule limits the broad sweep of this language. Namely, the rule purports to ensure that a signatory "cannot, on the one hand, seek to hold the non-signatory liable pursuant to *duties* imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory." *Goldman*, 173 Cal. App. 4th at 220 (emphasis added) (quoting *Grigson*). Plaintiff has obviously not sought to hold Twilio liable for any "duty" imposed by Calm's Terms of Service —the Terms don't even mention "Twilio," let alone impose specific duties on it. Plaintiff does not cite or quote the Calm Terms of Service anywhere in his Complaint, and does not need to.

1    "[E]ven if a plaintiff's claims 'touch matters' relating to the arbitration agreement, 'the claims are

2    not arbitrable unless the plaintiff relies on the agreement to establish its cause of action.'" *Jensen*

3    *v. U-Haul Co. of California*, 18 Cal. App. 5th 295, 306  (Cal. Ct. App. 2017) (italics omitted). Of

4    course, the Terms might be relevant to Twilio's affirmative defenses—like consent—but

5    Plaintiff need not negate every potential affirmative defense to make out his prima facie case in

6    the complaint. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018)

7    (holding that when a document is not referenced in a complaint but "merely creates a defense to

8    the well-pled allegations," it does not "form the basis of the complaint.").

9         Moreover, Twilio argues throughout its motion that Plaintiff's claims "are intertwined

10    with his contract with Calm because they require interpretation of the Calm Privacy Policy."

11    (Dkt. 19 at 9) (emphasis omitted). But the Privacy Policy is *not* the agreement containing the

12    arbitration clause; rather, the arbitration provision appears in the Calm Terms of Service. Twilio

13    assumes, without analysis, that the Calm Terms "incorporate" the Privacy Policy. (Dkt. 19 at 4.)

14    But they don't. According to Twilio's filings, the page that pops up on a user's device when they

15    click the "Terms" hyperlink has a large title, reading "Calm Terms." (Dkt. 20, ¶ 15) (reproducing

16    version users would purportedly see on mobile devices). Beneath that title are the various

17    provisions which comprise the Terms. (*Id.*) *Above* that heading (and before any contractual

18    language appears) are three lines of text. (*Id.*) The first reads: "Please refer to the <u>Privacy Policy</u>

19    for information regarding how we collect, use, and disclose information about you[,]" with a

20    hyperlink. (*Id.*) On its face, this description of the Privacy Policy merely redirects users to

21    additional "information." A reasonable user wouldn't interpret that as importing the Privacy

22    Policy into the Terms, but rather referring anyone curious about Calm's use of personal data *out*,

23    to a wholly separate document. (That impression would be reinforced by the two lines of text

24    immediately following, explaining that users in the European Union are bound by a different set

25    of Terms not presented on the page below.) The location of the link above the title of the Terms

26

27

28

(and outside the body of its contractual provisions) also undermines any claim that a reasonable user accessing the Terms would have necessarily assented to the incorporation of the Privacy Policy. Accordingly, Twilio has only argued that Plaintiff's claims "rely" on the Privacy Policy, which cannot suffice to subject Plaintiff to the arbitration provision in the Terms.

As for the "interdependent misconduct" prong, Twilio simply misrepresents Plaintiff's allegations; even a cursory reading of the Complaint confirms that Twilio is the "principal wrongdoer." (Dkt. 19 at 13, 14.) According to Twilio, "the core theory of Plaintiff's case is that Calm allegedly colluded with Twilio to secretly collect and use Calm users' information for their mutual profit." (*Id.* at 13.) That is not in the Complaint: Plaintiff alleges nothing about Calm's intentions in collaborating with Twilio, and nothing about Calm's profits. Nor does Plaintiff allege "coordinated misconduct," (*id.* at 14), between Twilio and Calm. While Calm's platform might have been required for Twilio to obtain Mr. Bender's data and communications in a metaphysical sense, alleging that Calm's use of the SDK "allow[ed] Defendant to intercept communications between Plaintiff and Calm" does not imply a *conspiracy* between Calm and Twilio to commit wire fraud or unlawfully access Mr. Bender's device. *See* (Comp. ¶ 31.) On the contrary, Twilio's alleged wrongdoing stands alone in the Complaint. Twilio is the "unknown third party" siphoning Calm user data. (Comp. ¶ 20.) And more ominously, it is Twilio's proprietary process of "identity resolution" that compiles the data of individual users into dossiers. (*Id.* ¶¶ 26-27.) Finally, Twilio discloses that data on the internet to "even more unknown third parties." (*Id.* ¶ 29.) These allegations are materially different from any claims Mr. Bender might have against a first-party collector like Calm. *See Pac. Fertility Cases*, 85 Cal. App. 5th 887, 898 (2022) (finding no interdependent misconduct where plaintiffs would necessarily have "fundamentally different claims" against signatory and non-signatory).

Twilio is right about one thing, though: "Plaintiff has not sued Calm in any forum." (Dkt. 19 at 2.) Mr. Bender is not seeking a second bite at the apple after bringing the same claims

1  against another wrongdoer with an arbitration provision. Nor has he refrained from bringing

2  claims against Calm "tactically," to avoid such an outcome. (*Id.* at 9.) He's simply suing the

3  entity that most directly violated his statutory rights: Twilio.

**CONCLUSION**

5       Because Defendant has failed to establish that Mr. Bender assented to Calm's Terms of

6  Service, or that even if he had, Defendant would be entitled to enforce those terms as a non-

7  signatory, Defendant's motion to compel arbitration should be denied.

Respectfully submitted,

**NOAH BENDER**, individually and on
behalf of all others similarly situated,

Dated: December 18, 2024

By: */s/ Jared Lucky*
*One of Plaintiff's Attorneys*

Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Jared Lucky (SBN 354413)
jlucky@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Schuyler Ufkes*
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought*

*Counsel for Plaintiff and the Putative Class*