Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Jared Lucky (SBN 354413)
jlucky@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Schuyler Ufkes*
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice admission to be sought

Counsel for Plaintiff and the Putative Classes

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| NOAH BENDER, individually and on behalf of all others similarly situated,<br><br>     *Plaintiff,*<br><br>  *v.*<br><br>TWILIO INC., a Delaware corporation,<br><br>     *Defendant.* | Case No. 3:24-cv-04914-AMO<br><br>**PLAINTIFF'S OPPOSITION TO TWILIO'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)**<br><br>Date: June 6, 2025<br>Time: 2:00 P.M.<br>Location: Dept. 10, 19th Floor<br>Judge: Hon. Araceli Martinez-Olguin<br><br>Date Filed: August 8, 2024<br>Trial Date: None Set |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

STANDARD OF REVIEW ....................................................................................... 3

ARGUMENT ............................................................................................................ 4

I.    Mr. Bender did not consent to Twilio's interceptions. ................................ 4

II.    Twilio acted with the requisite intent. ......................................................... 7

III.    Plaintiff has adequately alleged a claim under the CIPA. ............................ 8

    A.    Mr. Bender's § 631 claim is not barred by the "party exception." ..... 8

    B.    Twilio intercepted Plaintiff's communications "in transit." .............. 10

    C.    Twilio receives substantive information about the intercepted
        communications. ................................................................................. 12

    D.    Twilio reads or learns the contents of Plaintiff's communications. ... 14

    E.    Twilio uses what it learns from the intercepted communications in
        violation of § 631's third clause. ....................................................... 14

IV.    Twilio cannot establish one-party consent under the Wiretap Act. ........... 14

V.    Twilio identifies no basis to dismiss Plaintiff's CDAFA claim. ............... 16

    A.  The Complaint appropriately puts Twilio on notice of the conduct
        supporting the CDAFA claim. ............................................................ 16

    B.  Twilio accessed Plaintiff's phone within the meaning of the CDAFA. .... 16

    C.  Circumvention of technical barriers is not required to state a claim under
        § 502(c)(7). ......................................................................................... 17

    D.  Plaintiff was damaged by Twilio's conduct. ..................................... 18

CONCLUSION ....................................................................................................... 19

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................................... 3

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................................... 3

**Federal Circuit Court Cases**

*ASARCO, LLC v. Union Pac. R.R. Co.,*
    765 F.3d 999 (9 Cir. 2014) ............................................................................ 3

*Calhoun v. Google, LLC,*
    113 F.4th 1141 (9th Cir. 2024) ..................................................................... 5

*In re Facebook, Inc. Internet Tracking Litig.,*
    956 F.3d 589 (9th Cir. 2020) .................................................................. 13, 19

*In re Zynga Priv. Litig.,*
    750 F.3d 1098 (9th Cir. 2014) ..................................................................... 13

*United States v. Christensen,*
    828 F.3d 763 (9th Cir. 2018) .................................................................. 13, 19

**United States District Court Cases**

*Brown v. Google LLC,*
    525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........................................... 5, 15, 16

*Brown v. Google LLC,*
    685 F. Supp. 3d 909 (N.D. Cal. 2023) ............................................ 17, 18, 19

*Campbell v. Facebook, Inc.,*
    77 F. Supp. 3d 836 (N.D. Cal. 2014) ............................................................ 5

*Cody v. Boscov's, Inc.,*
    658 F. Supp. 3d 779 (C.D. Cal. 2023) ........................................................... 9

*Cousin v. Sharp Healthcare,*
    681 F. Supp. 3d 1117 (S.D. Cal. 2023) ....................................................... 11

*Doe v. FullStory, Inc.,*
    712 F. Supp. 3d 1244 (N.D. Cal. 2024) .................................................... 4, 5

*Esparza v. UAG Escondido A1 Inc.*,
    No. 23CV0102 DMS(KSC), 2024 WL 559241 (S.D. Cal. Feb. 12, 2024) ................... 11, 12

*Facebook, Inc. v. Power Ventures, Inc.*,
    No. C 08–05780 JW, 2010 WL 3291750 (N.D. Cal. July 20, 2010) ................................. 18

*Gladstone v. Amazon Web Servs., Inc.*,
    No. 2:23-cv-00491, 2024 WL 3276490 (W.D. Wash. July 2, 2024) .................................... 7

*Graham v. Noom, Inc.*,
    533 F. Supp. 3d 823 (N.D. Cal. 2021) ................................................................................ 9

*Greenley v. Kochava, Inc.*,
    684 F. Supp. 3d 1024 (S.D. Cal. 2023) ............................................................................ 17

*Hammerling v. Google LLC*,
    615 F. Supp. 3d 1069 (N.D. Cal. 2022) ........................................................................... 11

*Heiting v. Taro Pharmaceuticals USA, Inc.*,
    709 F. Supp. 3d 1007 (C.D. Cal. 2024) ..................................................................... 11, 12

*In re Carrier IQ, Inc.*,
    78 F. Supp. 3d 1051 (N.D. Cal. 2015) ............................................................................. 18

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ............................................................................... 5

*In re Google, Inc.*,
    No. 13–MD–02430–LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ........................... 5

*James v. Walt Disney Co.*,
    701 F. Supp. 3d 942 (N.D. Cal. 2023) ............................................................................. 11

*Javier v. Assurance IQ, LLC*,
    649 F. Supp. 3d 891 (N.D. Cal. 2023) .......................................................................... 9, 10

*Licea v. Cinmar, LLC*,
    659 F. Supp. 3d 1096 (C.D. Cal. 2023) ............................................................................. 4

*M.G. v. Therapynatch, Inc.*,
    No. 23-cv-04422-AMO, 2024 WL 4219992 (N.D. Cal. Sept. 16, 2024) ............................ 12

*Marden v. LMND Med. Grp., Inc.*,
    No. 23-cv-03288-RFL, 2024 WL 4448684 (N.D. Cal. July 3, 2024) ................................. 13

*Ng v. Nissan N. Am., Inc.*,
    2023 WL 9150275 (N.D. Cal. Dec. 27, 2023) .................................................................... 3

*NovelPoster v. Javitch Canfield Group*,
    140 F. Supp. 3d 954 (N.D. Cal. 2014) ................................................................. 17

*Rodriguez v. Google LLC*,
    No. 20-cv-04688, 2021 WL 2026726 (N.D. Cal. May 21, 2021) ..................... 5, 18

*Smith v. Google LLC*,
    No. 23-cv-03527-PCP, 2024 WL 2808270 (N.D. Cal. June 3, 2024) ............... 4, 10

*Turner v. Nuance Commc'ns, Inc.*,
    No. 22-CV-05827-DMR, 2024 WL 2750017 (N.D. Cal. May 28, 2024) ......... 9, 10

*Valenzuela v. Keurig Green Mountain, Inc.*,
    674 F. Supp. 3d 751 (N.D. Cal. 2023) ................................................................. 11

*Valenzuela v. Nationwide Mut. Ins. Co.*,
    686 F. Supp. 3d 969 (C.D. Cal. 2023) .......................................................... 11, 14

*West v. Ronquillo-Morgan*,
    526 F. Supp. 3d 737 (C.D. Cal. 2023) ................................................................. 17

*Yockey v. Salesforce, Inc.*,
    No. 22-CV-09067-JST, 2024 WL 3875785 (N.D. Cal. Aug. 16, 2024) ......... 11, 12

**California Supreme Court Cases**

*Ribas v. Clark*,
    38 Cal.3d 355 (1985) ...................................................................................... 8, 9, 10

**California Court of Appeals Cases**

*Flanagan v. Flanagan*,
    27 Cal.4th 766 (2002) ......................................................................................... 19

*Rogers v. Ulrich*,
    52 Cal.App.3d 894 (1975) ............................................................................ 8, 9, 10

**Statutes**

18 U.S.C. § 1030 ......................................................................................................... 19

18 U.S.C. § 2511 ................................................................................................. *passim*

Cal. Penal Code § 502 ............................................................................... 3, 16, 17, 19

Cal. Penal Code § 631 ....................................................................................... 8, 9, 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Fed. R. Civ. P. 12 ..................................................................................................................... 3

Fed. R. Civ. P. 9 ....................................................................................................................... 8

**INTRODUCTION**

This case concerns the data mining company Twilio Inc. ("Defendant" or "Twilio"), and a method by which it gains backdoor access to the phones of millions of consumers, like Plaintiff Noah Bender. Using what is known as a "software development kit," or "SDK," which Twilio markets to consumer-facing businesses, Twilio surreptitiously gains the ability to intercept sensitive data sent between individuals and Twilio's clients. In this case, Mr. Bender alleges that his communications with the Calm meditation app were intercepted by Twilio and put to use for Twilio's own purposes. Mr. Bender brings claims under the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, the Federal Wiretap Act, 18 U.S.C. § 2511, and the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502. Twilio's motion to dismiss these claims should be denied.

First, Twilio's arguments about consent and mental state all rest on factual submissions that Plaintiff has not had the opportunity to interrogate, and which cannot be considered at this stage. Moreover, to the extent these documents could be considered, none of Twilio's submissions show that Mr. Bender ever was informed that *Twilio* would be intercepting his communications and using them for its own purposes.

Second, Twilio is wrong that it is a party to the communications between Mr. Bender and Calm. While Calm may have contracted with Twilio to provide certain services, Twilio's sophisticated data analytics, and ability to use that data for its own purposes, make Twilio far more than a passive tool used by Calm, and more like an unannounced third party listening in on Mr. Bender's communications.

Third, Twilio's remaining arguments for dismissal of the CIPA claim fail. Mr. Bender's allegations, for instance, show that Twilio intercepts communications in transit, that the information Twilio receives is the substance of Mr. Bender's communications and not, as Twilio argues, "record information" about the communication, and that Twilio reads the information as it processes it.

Fourth, Twilio cannot obtain dismissal of Mr. Bender's Federal Wiretap Act claim on the grounds that Calm itself provided the necessary consent. Any potential facts supporting that affirmative defense must be developed in discovery.

Finally, none of Twilio's arguments for dismissal of Plaintiff's CDAFA claim have merit. Twilio's suggestion that it cannot tell what conduct supports the claim is borderline frivolous. Its argument that it has not "accessed" Mr. Bender's device is incorrect for all three alleged violations of the law. And Twilio's attempts to limit what sorts of damages are cognizable are inconsistent with the language of the statute.

The motion to dismiss should be denied.

## BACKGROUND

Twilio is a data mining company. (Dkt. 1, Complaint ("Compl.") ¶ 1.) Twilio collects granular data on consumers ranging from name and email address to a compilation of their online activity, including page views, search terms, keystrokes, and more. (*Id.* ¶¶ 3, 16-17.) Twilio's business relies on taking this incredibly sensitive data, building a comprehensive profile of individual consumers, and sharing that profile with advertising partners, data warehouses, and others willing to pay. (*Id.* ¶ 12.)

The claims here focus on one way in which Twilio collects such data: its software development kit, or SDK. An SDK is a collection of reusable pieces of computer code designed to perform particular functions. (*Id.* ¶ 14.) SDKs are incorporated into consumer-facing apps to save time and execute specific tasks. (*Id.*) In this case, Twilio's SDK essentially opens a backdoor in a consumer's device, allowing Twilio to ingest all sorts of sensitive data about the consumer's use of the app, which it correlates with data it has ingested from a variety of other sources. (*Id.* ¶¶ 15, 26.)

The app at issue here is the Calm meditation app. (*Id.* ¶ 30.) To use Calm, a consumer will typically select their current mood, and use the app's search function to find content related to their state of mind. (*Id.* ¶ 19.) Through its SDK, Twilio inserts itself into these communications between the user and the Calm app, collecting the user's in-app activity in real time. (*Id.*) By intercepting this data, Twilio obtains information about the consumer's interests, mental health, and even what other

apps they have on their phone, their shopping histories, and other preferences. (*Id.* ¶ 24.) That data is then correlated with other data that Twilio has collected on particular consumers to create a unified profile about the individual consumer. (*Id.* ¶ 26.) Using this illicitly sourced information, Twilio then employs proprietary artificial intelligence to predict a consumer's future behavior, information which can be exploited by Twilio's paying clients. (*Id.* ¶ 28.) Twilio also shares this data with additional third parties, such as through its integrations into several popular advertising networks. (*Id.* ¶ 29.) The Calm user is never informed that Twilio is intercepting these communications or given an opportunity to consent to them. (*Id.* ¶¶ 20-21.)

Plaintiff Noah Bender downloaded and used the Calm meditation app within the last year. (*Id.* ¶ 30.) He alleges that, as with other Calm users, Twilio's SDK permitted Twilio to collect his keystrokes, button presses, search terms, page views, and information about his device and other apps he uses. (*Id.* ¶ 31.) At no point did Mr. Bender consent to Twilio's interception of his communications. (*Id.* ¶¶ 32-33.) Mr. Bender contends that these actions by Twilio violate the CIPA, Cal. Penal Code § 631, the Federal Wiretap Act, 18 U.S.C. § 2511, and the CDAFA, Cal. Penal Code § 502.

**STANDARD OF REVIEW**

Twilio moves to dismiss these claims under Fed. R. Civ. P. 12(b)(6). On a motion under Rule 12(b)(6), the Court "accepts all factual allegations as true and draws all reasonable inferences in favor of the plaintiff." *Ng v. Nissan N. Am., Inc.*, 2023 WL 9150275, at *2 (N.D. Cal. Dec. 27, 2023). "To survive a Rule 12(b)(6) motion, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To grant a 12(b)(6) motion based on an affirmative defense, the defendant must show 'some obvious bar to securing relief on the face of the complaint.'" *Ng*, 2023 WL 9150275, at *2 (quoting *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)).

**ARGUMENT**

**I.    Mr. Bender did not consent to Twilio's interceptions.**

Twilio first urges that all of Plaintiff's claims fail because he consented to Twilio's actions. Twilio contends that such consent is established through the Calm application's Privacy Policy and Terms of Service, which (Twilio claims) are subject to judicial notice, or incorporated by reference in the Complaint. (Dkt. 21, Motion to Dismiss Plaintiff's Complaint, at 10-11.) This argument fails for several reasons.

First, Mr. Bender alleges that neither he nor any other class member is notified about Twilio's conduct, or asked to consent to it. (Compl. ¶¶ 20-23.) Courts generally hold that such allegations suffice at this stage. *See Licea v. Cinmar, LLC*, 659 F. Supp. 3d 1096, 1106 (C.D. Cal. 2023).

Second, whether or not the various terms of service or privacy policies are subject to judicial notice, "the mere existence of various terms of service and privacy policies cannot establish at this stage, that [the Plainitff] *did* in fact consent." *Smith v. Google LLC*, No. 23-cv-03527-PCP, 2024 WL 2808270, at *3 (N.D. Cal. June 3, 2024). Twilio apparently appreciates the issue. Its request for judicial notice also includes what it claims are various signup flows which supposedly put Mr. Bender on notice of documents that, Twilio says, disclose the existence of the relevant data practices. But as explained in Plaintiff's Opposition to Twilio's Request for Judicial Notice, nothing that Twilio has submitted shows that Plaintiff did in fact consent to Twilio's conduct, or even that Plaintiff saw Calm's Terms of Service or Privacy Policy.

Finally, even if the Court considers Calm's Terms of Service or Privacy Policy, Twilio's consent argument fails because none of its cited documents state, or even imply, that *Twilio* will be intercepting a Calm user's communications or other app activity or using it for its own purposes— indeed, none of them even mention "Twilio." "On a motion to dismiss, the burden of proof to show consent rests with defendant[]." *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1253 (N.D. Cal. 2024). To establish actual consent based on Mr. Bender's purported agreement to these documents, Twilio must show that the documents "explicitly notify" Mr. Bender about the challenged practice.

1   *In re Google, Inc.*, No. 13–MD–02430–LHK, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013).

2   This notification must concern the "specific" practice at issue. *Campbell v. Facebook, Inc.*, 77 F.

3   Supp. 3d 836, 847 (N.D. Cal. 2014); *see Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir.

4   2024) (consent "is only effective if the person alleging harm consented to the particular conduct, or

5   to substantially the same conduct and if the alleged tortfeasor did not exceed the scope of that

6   consent") (internal quotation marks omitted). And to obtain dismissal at this stage, Twilio must

7   show that its Terms of Service and Privacy Policy admit of only one interpretation; that is, an

8   interpretation which specifically discloses the challenged conduct. *See In re Facebook, Inc.*

9   *Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 794 (N.D. Cal. 2019) ("But recall that

10  in the context of this motion to dismiss the plaintiffs may be deemed to have consented to this

11  arrangement only if that is the only plausible interpretation."). Documents that leave some doubt

12  about whether Plaintiff has consented to the challenged practice will not support dismissal. *See id.*

13  at 789-90 ("[I]f a reasonable Facebook user could plausibly have interpreted the contract language

14  as *not* disclosing that Facebook would engage in particular conduct, then Facebook cannot obtain

15  dismissal of a claim about that conduct (at least not based on the issue of consent)"); *Brown v.*

16  *Google, LLC*, 525 F. Supp. 3d 1049, 1064 (N.D. Cal. 2021) (rejecting consent defense where

17  privacy policy did not expressly disclose the challenged data collection, and a user "might have

18  reasonably concluded" that the collection did not occur); *FullStory*, 712 F. Supp. 3d at 1254 ("At

19  this point … [h]ow reasonable persons would interpret the totality of the disclosures has not been

20  decided. Accordingly, the claims will not be dismissed for any defendant based on consent.");

21  *Rodriguez v. Google LLC*, No. 20-cv-04688, 2021 WL 2026726, at *4-5 (N.D. Cal. May 21, 2021)

22  (rejecting argument concerning privacy policy because plaintiffs' contrary reading was "cogent"

23  and totality of disclosures was "confusing" and "fragmented").

24    Twilio's cited documents fail to establish consent under this standard. The Terms of Service

25  (Dkt. 32, Declaration of Natalie Heim ("Heim Decl.") Exs. V and W) offer nothing that could

26  conceivably alert the reader to Twilio's conduct, and instead merely refer the reader to the Privacy

27  Policy.

And the Privacy Policy does not establish Twilio's defense. Within Exhibit E—the version of the Privacy Policy effective until October 13, 2023—under the heading "Sharing of Information," the only conceivable entry revealing Twilio's conduct is one that reads: "[Calm] may share information about you as follows and as otherwise described in this Privacy Policy or at the time of collection … [w]ith companies and contractors that perform services for us, including email service providers, payment processors, fraud prevention vendors, and other service providers[.]" (Heim Decl. Ex. E, at 3.) Later versions include "analytics providers" and "advertising partners" among those with whom information might be disclosed. (*E.g.*, Heim Decl. Ex. C, at 4.) Citing to documents that are not properly before the Court at this point, Twilio insists that this language refers to it, but again, none of these documents ever mentions "Twilio." Vague references to "companies," "contractors," "analytics providers," and "advertising partners" cannot put users on notice of who specifically (like Twilio) is intercepting their data. In all versions, the very next section of the Privacy Policy, titled "Advertising and Analytics Provided by Others," states that "We allow others to provide analytics services and serve advertisements on our behalf across the web and other online services." (Heim Decl. Ex. E, at 5.) Together these statements suggest to a reasonable reader (1) that information is disclosed by Calm, rather than intercepted by a third party, and (2) used for purposes related to Calm, rather than for the purposes of that third party (for instance, that the disclosed information is used to provide "analytics services … on our behalf"). (*Id.*)

As Twilio points out, this section goes on to explain that "[t]hese entities use cookies, web beacons, device identifiers and other technologies to collect information" that is "used by Calm and others to, among other things, analyze and track data, determine the popularity of certain content, deliver advertising and content targeted to your interests on our Services and other websites and online services, and better understand your online activity." (Heim Decl. Ex. E, at 4.) This is the closest the Privacy Policy comes to disclosing anything like what Twilio does, but it still doesn't establish consent (even assuming, which we cannot do at the stage, that Mr. Bender ever saw or agreed to this Policy). First, it doesn't even mention Twilio. Second, Twilio's conduct is supposedly hidden inside the term "other technologies." But the problem there is that a reasonable reader would

assume that "other technologies" are things like "cookies, web beacons, [and] device identifiers." It is not at all clear that Twilio's backdoor data pipeline is like those things. Third, whatever this language might mean on its own, it is qualified by the two previous statements concerning disclosures, specifically that any services are "performed for [Calm]" or "on [Calm's] behalf." The allegations here are different.

These documents do not, alone or in combination, disclose Twilio's interceptions. Accordingly, Twilio cannot obtain dismissal of any of Mr. Bender's claims on the grounds that Mr. Bender provided consent.

## II.    Twilio acted with the requisite intent.

Twilio next contends that it did not act knowingly, willfully, or intentionally, thus precluding liability under the various statutes invoked by Mr. Bender, because Twilio contract with Calm purports to require Calm to obtain the necessary consents to provide information to Twilio. (Dkt. 21 at 12-13.) The argument is, in the first place, based upon a document that is not a part of Plaintiff's Complaint, and which cannot be judicially noticed. Moreover, courts have generally rejected the notion that such contractual provisions preclude a showing of the requisite intent at the pleadings stage. *See, e.g.*, *Gladstone v. Amazon Web Servs., Inc.*, No. 2:23-cv-00491, 2024 WL 3276490, at *11 (W.D. Wash. July 2, 2024) ("Defendant points out that it 'contractually requires companies that use Amazon Connect to provide notice and obtain consent from their customers[,]' but the 'Court is not convinced that Defendant's inclusion of a catch-all provision requiring its customers to comply with the law generally is enough to satisfy its legal obligations' under CIPA.") (cleaned up). That result should obtain here, as well. Twilio's inclusion of such a clause in its standard agreement betrays its understanding that it is a third-party to confidential communications between individuals and Twilio clients, like Calm. But Twilio can offer nothing at this stage to show that Calm actually agreed to the highlighted contractual term, or even that Twilio bothers to check for, or enforce compliance with, the highlighted term. Moreover, the claim here is that Twilio *intercepted* communications between Plaintiff and Calm. The contract Twilio points to only asks Calm to obtain the consents needed for Calm to *provide* user data to Twilio—that's not the same thing as getting

consent for Twilio to intercept communications between Calm and users at Twilio's own initiative. Plaintiff's state of mind allegations, which of course may be alleged "generally," *see* Fed. R. Civ. P. 9(b), suffice at this stage.

### III.   Plaintiff has adequately alleged a claim under the CIPA.

Twilio raises a handful of arguments it says require dismissal of Plaintiff's claim under the CIPA, Cal. Penal Code § 631(a). First, Twilio depicts itself as a mere extension of Calm, and not an independent third party capable of intercepting the relevant communications. Second, it says that any communications it did collect were not intercepted "in transit" within the meaning of the statute. Third, it says it received only "record information" about the communications. Fourth, it says it did not "read or learn" the contents of these communications. And finally, it says that Plaintiff cannot make out a claim based on Twilio's supposed "use" of the intercepted communications. As explained below, these arguments all fail.

#### A.   Mr. Bender's § 631 claim is not barred by the "party exception."

Twilio contends that it cannot be liable under § 631 because it is merely an "extension" of Calm, and therefore a party to the communications between Mr. Bender and Calm, and not the kind of entity that can intercept or eavesdrop on these communications.

The argument relies upon the distinction articulated in two California cases: *Ribas v. Clark*, 38 Cal.3d 355 (1985), and *Rogers v. Ulrich*, 52 Cal.App.3d 894 (1975). In *Rogers*, the defendant secretly tape recorded a phone call he received from the plaintiff, and later replayed that call to a third party. *Id.* at 896. The court held that "participant recording" was not unlawful under § 631, because the statute prohibits secret eavesdropping, and "only a third party can listen secretly to a private conversation." *Id.* at 898-99.

In *Ribas*, the California Supreme Court held that § 631 embodies a distinction between "the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device." 38 Cal.3d at 360-61. *Ribas* involved a plaintiff's suit against his wife's friend, who was listening to a phone conversation with the wife on an extension telephone line without the plaintiff's knowledge. *Id.* at

358. The friend, the court held, could be liable under § 631. *Id.* at 361. *Ribas* observed that "an important aspect of privacy of communication [is] the right to control the nature and extent of the firsthand dissemination of his statements." *Id.* But that right is satisfied by knowing who is listening to a conversation, because one always runs the risk that a call participant will subsequently relay the contents of that call to third parties.

With respect to alleged participants like Twilio, district courts applying *Ribas* and *Rogers* ask whether the defendant is *capable* of using what it learns on the call for its own purposes. *See Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023); *Turner v. Nuance Commc'ns, Inc.*, No. 22-CV-05827-DMR, 2024 WL 2750017, at *10 (N.D. Cal. May 28, 2024). An entity that is capable of using what it learns for its own purposes is much more like the hypothetical friend on the line in *Ribas* than the inanimate tape recorder in *Rogers*.

A small handful of decisions have held that the defendant must actually use what it learns for its own purposes. *See, e.g., Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 832-33 (N.D. Cal. 2021) (dismissing § 631(a) claim under party exception because "there are no allegations here that FullStory intercepted and used the data itself"); *Cody v. Boscov's, Inc.*, 658 F. Supp. 3d 779, 782 (C.D. Cal. 2023) ("The Court further concludes that in order to establish such violations, Plaintiff must provide facts suggesting that Webex and Kustomer are recording Defendant's customers' information for some use or potential future use beyond simply supplying this information back to Defendant."). But other decisions have observed that an actual use requirement is inconsistent with both the statutory text of § 631(a) and with *Ribas*. *See, e.g., Turner*, 2024 WL 2750017, at *9-10; *Javier*, 649 F. Supp. 3d at 900. As for the text, § 631(a) separately prohibits *both* eavesdropping *and* using any information obtained via eavesdropping or wiretapping. *See* Cal. Penal Code § 631(a). Thus, adding a "use" requirement for an eavesdropper to be a party would "add requirements that are not present (and swallow the third [clause] in the process)." *Javier*, 649 F. Supp. 3d at 900. And as for *Ribas*, liability there was found without any showing that the eavesdropping friend used the information she obtained, or any discussion of intent. *Ribas*, 38 Cal.3d at 358-62.

Plaintiff submits that the latter rule, espoused first in *Javier*, is more faithful to the statutory text. *See also Turner*, 2024 WL 2750017, at *10 (joining "a growing number of district courts" to follow *Javier*'s lead). But it is also unnecessary to take sides here because the Complaint alleges that Twilio "used the intercepted communications for its own purposes," specifically to "create a unified customer profile" gleaned from data collected through various applications, which is in turn used to "make various behavioral predictions" about individuals like Plaintiff. (Compl. ¶¶ 45, 60.)

Twilio contends that allegations like this which rely on information gleaned from Twilio's website can be disregarded because the Complaint supposedly misinterprets that website. Of course, the fact that Twilio's website makes certain representations about its products does not mean that these representations are accurate or complete, and no such conclusion can be drawn at this stage. *See Smith*, 2024 WL 2808270, at *3 ("Second, Google seeks judicial notice of two other pages on its website that discuss Google Analytics. This request is similarly granted, but notice is again limited to the existence of these documents. The Court cannot conclude that these documents … accurately characterize how Google's tools operate."). Moreover, Twilio does not, and cannot, dispute the allegations that its business model "depends on collecting sensitive information from consumers' devices and sharing it," (Compl. ¶ 12), and that it "has created a platform that allows sharing of the data it harvested with even more unknown third parties" (Compl. ¶ 29), which also support the inference that Twilio is *at least* capable of using information intercepted from Plaintiff's communications for its own purposes. Twilio is more like the eavesdropping friend from *Ribas* than the tape recorder from *Rogers*, and is therefore not a party to Mr. Bender's communications with Calm. Thus, Twilio cannot escape liability under the "party exception" to the CIPA.

### B. Twilio intercepted Plaintiff's communications "in transit."

Twilio next contends that Plaintiff cannot establish a violation of clause 2 of § 631(a) because it did not "intercept" any communications while they were "in transit."[1] But as the Complaint explains, Twilio read Plaintiff's communications with Calm in "real time." (Compl.

---

[1] For the avoidance of doubt, Plaintiff wishes to make clear that he does not intend to raise any claim based on the first clause of § 631(a).

¶¶ 16-17.) The Complaint further explains that Twilio relies on "collecting sensitive information from consumers' devices" (Compl. ¶ 12), that is, before this information "reaches the intended recipient." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 960 (N.D. Cal. 2023). In other words, as Plaintiff was communicating with Calm via the Calm app, those same communications were "siphoned off" to an unannounced third party, Twilio. (Compl. ¶ 20.) These allegations suffice at this stage. *See, e.g.*, *Yockey v. Salesforce, Inc*., No. 22-CV-09067-JST, 2024 WL 3875785, at *5 (N.D. Cal. Aug. 16, 2024) (defendant was plausibly alleged to have intercepted messages "in transit" because the complaint alleged that the defendant "'receives the chat messages either before or simultaneously with' its clients—the intended recipients"); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022) (defendant plausibly alleged to have intercepted communications "in transit" because allegations showed that defendant collected communications "during users' usage of non-Google apps"); *Esparza v. UAG Escondido A1 Inc.*, No. 23CV0102 DMS(KSC), 2024 WL 559241, at *3 (S.D. Cal. Feb. 12, 2024) (allegations that messages sent via a webchat feature were read in "real time" sufficient to allege "in transit" interception); *Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 977 (C.D. Cal. 2023) (holding that Plaintiff sufficiently alleged that messages were intercepted "in transit" when she alleged that the third party "recorded" the "internet traffic" between the user and a website, and that the third party's "business model appears to rely on intercepting all or nearly all messages for mass data analysis"); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1131 (S.D. Cal. 2023) (allegation that website activity was captured in "real time" sufficient to allege that messages were intercepted "in transit").

When courts have found allegations regarding this element to be deficient, they have focused on the lack of explanation for how the defendant's code works or when the interception occurs. In *Valenzuela v. Keurig Green Mountain, Inc*, the court reasoned that alleging that such "real time" interception happened via code failed to provide more than speculation because the complaint did not explain how the "code" worked, or how it allowed third parties to "interface with Defendant's chat platform." 674 F. Supp. 3d 751, 758 (N.D. Cal. 2023). The court in *Heiting v. Taro Pharmaceuticals USA, Inc.* reasoned similarly: "Here, Plaintiff has alleged, in general terms, how

the interception occurs: through the code embedded on Defendant's website. However, Plaintiff has not added any additional factual details to make clear when the interception occurred." 709 F. Supp. 3d 1007, 1019 (C.D. Cal. 2024).

As to the first point—i.e., alleging how the defendant's code works—this reasoning is not persuasive. Alleging that computer code permits a third-party to observe and record a conversation in real time does far more than "parrot" the statutory requirement that any interception occur "in transit." And there should be no requirement that a plaintiff explain precisely how lines of computer code accomplish this task at the pleadings stage. That type of information is uniquely within the care and custody of the defendant. *See Esparza*, 2024 WL 559241, at *3 (reasoning that a pleading standard that demanded more detail "would require the CIPA plaintiff to engage in a one-sided guessing dame because the relevant information about data capture typically resides uniquely in the custody and control of the CIPA defendant") (quotations omitted).

As to the second point—alleging when the interception occurs—Plaintiff alleges sufficient detail here. As the complaint explains, when a Calm user inputs their mood into the app interface, or inputs a search query, that input is intended for the mobile app. (Compl. ¶ 18.) Twilio's Segment SDK collects those communications, however, before they reach Calm. (*Id.*) That shows that Twilio intercepts the communications before they reach their intended recipient or the destination server. *See Yockey*, 2024 WL 3875785, at *5 (distinguishing allegations of "real time" interception from cases in which "the messages were clearly in digital storage and therefore were not simultaneously or contemporaneously intercepted" and cases in which "the communications were considered not 'in transit' because the defendant gained access after receipt by the intended recipient"). Thus, the Complaint sufficiently alleges that Twilio intercepted Mr. Bender's communications "in transit."

**C.    Twilio receives substantive information about the intercepted communications.**

Next, Twilio contends that it receives only "record information" as opposed to the "contents" of Plaintiff's communications with Calm, and therefore that it cannot be held liable under CIPA or the Federal Wiretap Act. *See M.G. v. Therapynatch, Inc.*, No. 23-cv-04422-AMO, 2024 WL 4219992, at *3 (N.D. Cal. Sept. 16, 2024) (noting that both statutes penalize only learning

the contents of a communication). "'[C]ontents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). In other words, courts must consider whether the intercepted information is "information *about* a user's communication, or the communication itself." *Id.* at 1107 (emphasis added).

Plaintiff alleges Twilio gleans a wealth of information through its Segment SDK. This includes information about Plaintiff's current mood, what things he searches for on the Calm app, and what pages he views. (Compl. ¶¶ 19, 31, 57.) This sort of information is "content," not "record information." *See Therapymatch*, 2024 WL 4219992, at *4. In *Therapymatch*, the defendant offered an online platform to connect users with mental health providers. *Id.* at *1. A third-party allegedly intercepted information shared by users, including search terms, and inputted information regarding health conditions, the type of treatment the plaintiff sought, and provider preferences. *Id.* This Court held that such information was "content," because it was the substance of the user's communications with the app maker. *Id.* at *4. The same is true here: the information shared with Calm includes Plaintiff's current mental state, as well as Plaintiff's in-app searches and the content of the information he accessed. None of this is information *about* the communications, but is the communication itself. *See also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 605 (9th Cir. 2020) (observing that search terms are "content" as they may "divulge a user's personal interests, queries, and habits"); *Marden v. LMND Med. Grp., Inc.*, No. 23-cv-03288-RFL, 2024 WL 4448684, at *3 (N.D. Cal. July 3, 2024) ("Lemonaid's argument that Plaintiffs have failed to allege that any 'contents' of their communications were intercepted is likewise misplaced. Plaintiffs have adequately alleged that information about their queries as to treatment for sensitive health issues, prescription orders, and medical appointments were intercepted, which is substantive content.").[2]

---

[2]     Twilio also contests the CIPA claim by emphasizing Plaintiff's allegations that Twilio collects information like name, email address, advertising ID, device make and model, etc. (*See* Compl. ¶ 16.) This information is in fact sensitive—it allows companies like Twilio to correlate a user's activity across applications—but Twilio's collection of this information is not the basis for Plaintiff's CIPA claim. (*See* Compl. ¶ 57.)

Finally, in a footnote (dkt. 21 at 19, n.6) Twilio argues that even if "search terms" are "content," that would not matter because, Twilio says, Plaintiff does not allege that Twilio intercepted search terms in the Calm app or that Plaintiff ever conducted any searches. That is not true. (*See* Compl. ¶ 31) (alleging that Twilio intercepts "communications between Plaintiff and Calm such as . . . search terms he input into the Calm app" and "results of his searches.") Search terms (like Plaintiff's mood and page views) comprise the contents of his communications, and the Complaint adequately alleges that Twilio intercepts them.

### D.    Twilio reads or learns the contents of Plaintiff's communications.

Twilio also contends that it does not "read or learn" the contents of Plaintiff's communications with Calm. But as the Complaint explains, Twilio combines the information it learns into a user profile, categorizes the consumer into particular "audience segments" based on what it learns, and then uses that information to make predictions about the user's future behavior. (Compl. ¶¶ 26-28.) This sort of analysis is not possible unless Twilio is reading or learning the meaning of the contents of Plaintiff's communications with the Calm app. *See Valenzuela*, 686 F. Supp. 3d at 977 ("[T]hese allegations amount to a plausible claim that Akamai intercepted Valenzuela's messages and harvested data from them, which would almost certainly constitute reading, or attempting to read or to learn.").

### E.    Twilio uses what it learns from the intercepted communications in violation of § 631's third clause.

Finally, for the reasons expressed above, Plaintiff also states a plausible claim against Twilio under clause three of § 631(a) for *using* the information obtained by intercepting Plaintiff's communications with Calm. (*See* Compl. ¶¶ 26-29, 45, 60.)

In sum, there is no basis to dismiss Plaintiff's claim under the CIPA.

## IV.    Twilio cannot establish one-party consent under the Wiretap Act.

Turning to the Federal Wiretap Act claim, in addition to the overlapping arguments addressed above (state of mind and the "party exception"), Twilio seeks dismissal on the ground

that the federal wiretap law is a one-party consent statute, and that Calm provided the necessary consent.

The argument turns on a misreading of the Complaint. Paragraph 31 alleges that "The developers of the Calm mobile app embedded the Segment SDK into its mobile app allowing Defendant to intercept communications between Plaintiff and Calm … ." (Comp. ¶ 31.) According to Twilio, this paragraph means that the developers of Calm *permitted* Twilio to intercept these communications. (Dkt. 21 at 20.) What this paragraph actually says is that the installation of the Twilio SDK *enabled* Twilio to intercept these communications, not that Calm ever consented to allow Twilio to intercept communications between it and its users.

And Twilio does not otherwise cite to anything that may be properly considered at this stage that would demonstrate that it received consent to intercept communications between Plaintiff and Calm. The documents produced by Twilio, to the extent they are considered here, show that Calm agreed to share data with Twilio, not that Calm agreed that Twilio could intercept communications between Calm and its users. In the former scenario, of course, Calm remains in control of what data is given to Twilio, and users can hold it accountable for those choices. In the latter, Twilio ingests whatever information it desires, and for whatever purpose. *Cf. Brown*, 525 F. Supp. 3d at 1068 (concluding that Google's argument that websites had consented to its interceptions failed because "even assuming that Google has established that websites generally consented to the interception of their communications with users, Google does not demonstrate that websites consented to, or even knew about, the interception of their communications with users who were in private browsing mode").

Moreover, even if one party to a communication has given consent for the communication to be intercepted, liability may still attach if the communication was intercepted for the purpose of committing a crime or (more relevant here) a tort. Here, "consent is not a defense to Plaintiff['s] Wiretap Act claim because their communications were allegedly intercepted for the purpose of associating their data with user profiles, which is a criminal or tortious act in violation of the

1    Constitution or laws of the United States or of any State" including the CDAFA (as discussed

2    further below). *Brown*, 525 F. Supp. 3d at 1068.

3        Thus, consent does not provide a basis to dismiss Plaintiff's Wiretap Act claim.

4    **V.    Twilio identifies no basis to dismiss Plaintiff's CDAFA claim.**

5        Moving to the CDAFA, Twilio seeks dismissal on three grounds. First, it says, it cannot tell

6    what acts supposedly form the predicate for CDAFA liability. Next, it says Plaintiff fails to plead

7    "unauthorized access" to support a CDAFA claim. Finally, Twilio suggests that Plaintiff fails to

8    plead damages.

9        **A.    The Complaint appropriately puts Twilio on notice of the conduct supporting
              the CDAFA claim.**

10       The first argument borders on the frivolous. Plaintiff's claim is based upon Twilio's

11   exploitation of its SDK to "gain[] entry and/or cause[] output from [Plaintiff's] mobile device to

12   obtain Plaintiff's … In-App Activity." (Compl. ¶ 52.) The Complaint explains that "Twilio

13   surreptitiously collects sensitive data from consumers through its SDK," including identifying

14   information, and communications between the user and app maker. (Compl. ¶¶ 16-19.) The

15   Complaint adequately alleges that the embedded SDK is used to "siphon off" customer data.

16   Plaintiff contends that these facts show three types of violations of the CDAFA. *See* Cal. Penal

17   Code § 502(c)(1), (2), (7).

18       **B.    Twilio accessed Plaintiff's phone within the meaning of the CDAFA.**

19       Twilio next argues that the Complaint does not allege that it "accessed" Plaintiff's device,

20   and specifically, with respect to the theory under § 502(c)(7), that there are no allegations that

21   Twilio "circumvented technical barriers" to access Plaintiff's device. "Access" is defined by statute

22   to mean "to gain entry to, instruct, cause input to, cause output from, cause data processing with, or

23   communicate with, the logical, arithmetical, or memory function resources of a computer, computer

24   system, or computer network." Cal. Penal Code § 502(b)(1); *see also United States v. Christensen*,

25   828 F.3d 763, 789 (9th Cir. 2018) ("A plain reading of the [CDAFA] demonstrates that its focus is

26   on unauthorized taking or use of information."). The Complaint alleges that Twilio's SDK "caused

27   output" from Plaintiff's device (Compl. ¶ 52) because the SDK, which is "embedded" in the Calm

app, redirected communications between Plaintiff and the Calm app towards Twilio, which it ingested and used for its own purposes. (Compl. ¶¶ 18-20, 24.) In this way, Twilio opens a "data collection pipeline" between Plaintiff's device and Twilio. (Compl. ¶ 2.) These paragraphs plausibly allege that Twilio "accessed" Plaintiff's device. *See Brown v. Google LLC*, 685 F. Supp. 3d 909, 939-40 (N.D. Cal. 2023) (concluding that a triable issue of fact was presented whether Google "accessed" the plaintiff's device through code that allowed Google to "receive[] data from users' browsers directly").

### C.    Circumvention of technical barriers is not required to state a claim under § 502(c)(7).

Twilio contends that something more is required for Plaintiff's claim under § 502(c)(7). Unlike subsections (c)(1) and (c)(2), which focus on "knowing" access, subsection (c)(7) is violated when a party "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." To be knowing *and without permission*, Twilio argues, they must have "circumvented technical barriers." (Mot. at 21.) Courts have rejected this argument. In *NovelPoster v. Javitch Canfield Group*, for instance, the court concluded that the use of "technically-operable log-in information to access portions of a computer system which the individual knew he was not permitted to access" sufficed to show that the individual "knowingly" and "without permission" accessed the computer system. 140 F. Supp. 3d 954, 967 (N.D. Cal. 2014). As one judge put it, "[c]ircumventing technical barriers may be sufficient to show that a person acted 'without permission,' but that does not mean it is necessary for a person to circumvent technical barriers to act 'without permission.'" *West v. Ronquillo-Morgan*, 526 F. Supp. 3d 737, 746 (C.D. Cal. 2023) (holding § 502(c)(7) claim properly alleged when plaintiff granted defendant limited access to her social media profiles, for a specific purpose, and defendant nevertheless accessed other pages); *see also Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1049 (S.D. Cal. 2023) (rejecting argument that circumvention of technical barriers is required under § 502(c)(7) as inconsistent with plain language of the statute, and holding that "[c]ode hidden in embedded software may plausibly use or take computer data 'without permission'").

Some decisions, beginning with *Facebook, Inc. v. Power Ventures, Inc.*, No. C 08–05780 JW, 2010 WL 3291750, at *11 (N.D. Cal. July 20, 2010), have reasoned that access "without permission" under the CDAFA is limited to situations in which the defendant "circumvent[ed] technical or code-based barriers." But later decisions have recognized that the holding of *Power Ventures* itself was not so narrow, and, if so interpreted, would be inconsistent with the language of the statute. *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1099 (N.D. Cal. 2015). First, the central concern of *Power Ventures* was to avoid criminalizing computer access in violation of service terms, which might run afoul of the rule of lenity. *See Power Ventures, Inc.*, 2010 WL 3291750, at *11. By offering circumvention of technical or code-based barriers as an alternative, the decision was not drawing a bright line. *See id.*; *see also In re Carrier IQ*, 78 F. Supp. 3d at 1099 ("Nothing in the *Power Ventures* decision held that overcoming 'technical or code-based barriers' designed to prevent access was the *only* way to establish that the Defendant acted without permission."). And as *Carrier IQ* further observed, "[h]olding that a defendant acts with 'permission' for purposes of the CCDFA any time it does not need to overcome 'technical or code based barriers in place to restrict or bar a user's access' leads to results which strain the plain and ordinary meaning of the term 'permission.'" 78 F. Supp. 3d at 1100. The better reasoned decisions, like *Brown* and *Greeley*, reject this atextual barrier. *See also Rodriguez v. Google LLC*, 2021 WL 2026726, at *7 (rejecting *Power Ventures* and reasoning that "[b]ecause plaintiffs have alleged Google's knowing access to, and unpermitted taking of, plaintiffs' app activity data, they adequately state a claim under the CDAFA").

### D.    Plaintiff was damaged by Twilio's conduct.

Finally, Twilio contends that Plaintiffs have not suffered any cognizable damage under the CDAFA. First, Twilio contends that any damage must be to Plaintiff's phone, and second, that Plaintiff cannot plausibly allege unjust enrichment.

Taking these contentions in reverse order, Plaintiff plainly alleges that Twilio is unjustly enriched by its actions. (Compl. ¶ 53.) Twilio's suggestion that this allegation is not plausible is based entirely on a contract between it and Calm, which is not judicially noticeable and may well

not be the full story. (*See* Dkt. 21 at 22.) Dismissal on this basis would be inappropriate. Moreover, Twilio's business model relies on a "data collection pipeline" that reaps rewards from the "siphon[ed] data from millions of consumers." (Compl. ¶ 2.) Twilio collects this data because it is valuable, and can be monetized. Plaintiff suffered "damage or loss" under CDAFA because Twilio's unlawful data collection practices unjustly enriched Twilio. Plaintiff has a property interest in his data under California law. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 600 (plaintiffs sufficiently "allege[d] their browsing histories carr[ied] financial value"). Indeed, *Facebook Tracking* "stands for the proposition that plaintiffs can state an economic injury for their misappropriated data." *Brown*, 685 F. Supp. 3d at 940 (denying defendant's motion for summary judgment on CDAFA claim where plaintiffs alleged "a stake in the value of their misappropriated data").

Nor is it a sufficient answer to say that the "damage or loss" must be to the unlawfully accessed computer system, as Twilio suggests. The law does not define "damage or loss," nor does it limit a plaintiff to recovery of damages for particular types of harm. *See* Cal. Penal Code § 502(c). In this way, the law is unlike the federal Computer Fraud and Abuse Act, which strictly limit the terms "damage" and "loss." *See* 18 U.S.C. § 1030(e)(8), (11). Some courts have imputed similar limitations on recovery under the CDAFA, but as the Ninth Circuit has observed, "the statutes are different," and should not be interpreted consistently if the language does not dictate such an interpretation. *Christensen*, 828 F.3d at 789. With respect to "damage or loss," although the CDAFA offers an exemplar that is similar to the damages available under the federal law, the law provides only that "damage or loss *includes*" such damages. Cal. Penal Code § 502(c) (emphasis added); *see Flanagan v. Flanagan*, 27 Cal.4th 766, 774 (2002) ("'Includes' is 'ordinarily a term of enlargement rather than limitation.' The statutory definition of a thing as 'including' certain things does not necessarily place thereon a meaning limited to the inclusions.") (cleaned up). There is no basis to limit cognizable damages in the way urged by Twilio.

## CONCLUSION

The motion to dismiss should be denied.

1

2                                        Respectfully submitted,

3                                        **NOAH BENDER**, individually and on behalf of all
                                         others similarly situated,
4

5   Dated: December 18, 2024             By: /s/ *Jared Lucky*_____
                                         *One of Plaintiff's Attorneys*
6

7                                        Rafey Balabanian (SBN 315962)
                                         rbalabanian@edelson.com
8                                        Jared Lucky (SBN 354413)
                                         jlucky@edelson.com
9                                        EDELSON PC
                                         150 California Street, 18th Floor
10                                       San Francisco, California 94111
                                         Tel: 415.212.9300
11                                       Fax: 415.373.9435

12

13                                       Schuyler Ufkes*
                                         sufkes@edelson.com
14                                       EDELSON PC
                                         350 North LaSalle Street, 14th Floor
15                                       Chicago, Illinois 60654
                                         Tel: 312.589.6370
16                                       Fax: 312.589.6378

17

18                                       *Pro hac vice admission to be sought*

19                                       *Counsel for Plaintiff and the Putative Classes*

20

21

22

23

24

25

26

27