UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NOAH BENDER,

    Plaintiff,

v.

TWILIO INC.,

    Defendant.

Case No. 24-cv-04914-AMO

**ORDER GRANTING MOTION TO COMPEL ARBITRATION**

Re: Dkt. No. 19

Plaintiff Noah Bender brings this putative class action to represent consumers who downloaded and used any mobile application that included Defendant Twilio's software development kit ("SDK") without its presence being disclosed. Bender alleges the Twilio SDK "collects consumers' in-app search terms, search results, keystrokes, button presses, page views, and consumers' names and email addresses" without their knowledge or authorization. (ECF 1 ¶ 3.)[1] On these allegations, he asserts three causes of action: 1) violation of the Wiretap Act, 18 U.S.C. § 2510, *et seq*.; 2) violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), California Penal Code § 502; and 3) violation of the wiretapping provision of the California Invasion of Privacy Act ("CIPA"), California Penal Code § 631. Twilio moves to compel arbitration pursuant to an agreement between Bender and Calm.com, Inc., the creator of the mobile application he used, which included a Twilio SDK.

Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument. Having reviewed the parties' submissions, and the relevant legal authority, the Court **GRANTS** the motion to compel

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

1    arbitration.  Further, the case is **STAYED** pending arbitration.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract."  9 U.S.C. § 2.  "[A]rbitration agreements [are] on an equal footing with other contracts," and therefore, a court must "enforce them according to their terms."  *Rent-A- Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citations omitted).  In adjudicating a motion to compel arbitration, "a court's inquiry is limited to two 'gateway' issues: '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'"  *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).  Further, the court applies a summary judgment standard to resolve the motion.  *Hansen v. LMB Mortg. Servs., Inc*., 1 F.4th 667, 670 (9th Cir. 2021).  To prevail under this standard, Twilio must show there is no genuine issue of fact as to the formation of an agreement to arbitrate between Bender and Calm.com.  *See id*.

## FACTUAL BACKGROUND

Bender downloaded and used the Calm application on his Android device sometime between August 8, 2023, and August 8, 2024.  (*See* Tien Decl. (ECF 20) ¶ 4.)  During this time period, Calm.com presented notice to users of the Calm Terms of Service and its Privacy Policy in the following manner.  (*Id*. ¶ 5.)  When a user first downloads and opens the app, they are presented with a "Welcome Page."  (*Id*. ¶ 8.)

The Welcome Page features a deep blue background, and in contrasting white font states "Create an account to save your progress."  (*Id*. ¶ 9.)  Below that statement are three buttons, each of which say "Continue" and present different methods of creating an account—with email, with Facebook, or with Google.  (*Id*.)

//
//
//

[Screenshot of Calm app account creation screen with "Create an account to save your progress" and buttons for "Continue with Email", "Continue with Facebook", "Continue with Google", followed by the text: "By tapping Continue or logging into an existing Calm account, you agree to our Terms and acknowledge that you have read our Privacy Policy, which explains how to opt out of offers and promos" and "Have an account? Log in"]

Immediately below the three buttons, in the same white font as the initial statement, the page provides the following advisal of terms: "By tapping Continue or logging into an existing Calm account, you agree to our Terms and acknowledge that you have read our Privacy Policy, which explains how to opt out of offers and promos." (*Id*. ¶¶ 9-10.) The underlined words are hyperlinked and direct users to the following pages upon clicking:

//

//

//

//

3

 

(*Id*. ¶¶ 15, 18.)  Following the advisal language, the page states "Have an account? Log in."

(*Id*. ¶ 9.)

Once a user hits the "Continue with email" button, they are directed to the "Account Creation Page."  (*Id*. ¶ 10.)  The Account Creation Page, similar to the Welcome page, provides fields for the user to input their first name, their email, and a password.  (*Id*. ¶ 11.)  In addition, those fields are partitioned from the buttons for creating an account via social media login with a bold white line and the word "OR," prominently displayed.  (*Id*.)

//

//

//

//



(*Id.*)  Further, the advisal of terms appears once again beneath the buttons to continue with account creation via an existing social media account.  (*Id.*)  The font, underlining, hyperlinking, and color of the notice are all identical to the Welcome Page.

Once a user has created an account, they may encounter the "Login Page" upon subsequent usage of the app.  (*Id.* ¶ 12.)  As in the Account Creation Page, the Login Page is bifurcated by a bold white line with the word "OR," which separates email login from login via social media accounts.  (*Id.* ¶ 13.)

//

//

//



(*Id*.)  The notice of terms also appears at the bottom of the Login Page in a format identical to the previous two pages.  (*Id*.)  The Calm Terms of Service provide that a user may opt out of its arbitration provision.  (*Id*. ¶ 26.)  Calm.com has no record of Bender ever opting out of binding arbitration.  (*Id*. ¶ 27.)

## DISCUSSION

The instant motion presents two issues.  First, whether a valid agreement to arbitrate was formed between Bender and Calm.com.  Second, if a valid agreement was formed, can Twilio—as a nonsignatory—move to enforce it under the theory of equitable estoppel?  The Court addresses each issue in turn.

I.     **CONTRACT FORMATION**

"The existence of an arbitration agreement is a question for the Court, not an arbitrator."

*Singh v. Adobe Inc.*, No. 3:24-CV-03980-JSC, 2025 WL 2197142, at *2 (N.D. Cal. Aug. 1, 2025) (citing *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)). "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Here, the parties do not dispute California law applies. Under California law, a contract is not formed unless the parties "manifest their mutual assent to the terms of the agreement," which can be done through written or spoken word as well as conduct. *Id*. "These elemental principles of contract formation apply with equal force to contracts formed online. Thus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id*. at 855-56.

"In California, internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (citing *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 463 (2021). Here, Bender was provided with links to the Calm Terms of Service and Privacy Policy at the time of account creation and upon subsequent logins. (ECF 20 ¶¶ 9-14.) Further, the user was notified that "[b]y tapping Continue or logging into an existing Calm account, you agree to our Terms and acknowledge that you have read our Privacy Policy, which explains how to opt out of offers and promos." (*Id*. ¶ 9.) This constitutes a "sign-in wrap," and to assess whether Bender was on inquiry notice of the terms, the Court employs the framework set out in *Berman*:

> [A]n enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Berman*, 30 F.4th at 856.

The Court now considers whether Calm.com provided reasonably conspicuous notice to users of an agreement, and whether Bender manifested assent to that agreement.

### A. Reasonably Conspicuous Notice

Visual conspicuousness is a "fact-intensive" inquiry that requires the Court to consider the "totality of the circumstances." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025). In interpreting California law, the Ninth Circuit has highlighted "certain factors relevant to [the] visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast (against the page's background)." *Id*. However, "there is no bright-line test for finding that a particular design element is adequate in every circumstance." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1156 (9th Cir. 2025). "At bottom, when visually analyzing the conspicuousness of an advisal and any hyperlinks, courts must be tuned to the expectations of a reasonably prudent internet user." *Godun*, 135 F.4th at 710 (citation omitted). Here, the Calm app's advisal of the Terms of Service and Privacy Policy were conspicuous to a reasonably prudent internet user.

When users first download and open the Calm app, they are presented with a Welcome Page. (ECF 20 ¶ 9.) The page comprises a dark blue background, and the advisal stating users agree to the Calm Terms of Service and Privacy Policy is in a contrasting white font, right below the buttons to create an account. (*Id*.) The page lacks clutter and does not require a user to scroll to see the advisal. Further, the font size of the advisal is the same as other font on the page such as the instruction to "create an account to save your progress." (*See id*.) The hyperlinks to the Terms and Privacy Police are not set off in a separate font color, but they are underlined and are the only terms on the page set off in this way. The advisal also appears in two subsequent login pages after the user has created an account. (*See id*. ¶¶ 11, 13.) Based on the overall context of the design, a reasonably prudent internet user would be on inquiry notice of an agreement with Calm.com when creating an account. *See, e.g.*, *Perry-Hudson v. Twilio, Inc.*, No. 24-CV-03741-VC, 2024 WL 4933332, at *1 (N.D. Cal. Dec. 2, 2024) (determining a similar login page contained a reasonably conspicuous sign-in wrap); *Peter v. DoorDash, Inc*., 445 F. Supp. 3d 580, 586 (N.D. Cal. 2020) (same).

Indeed, these facts mirror those in *Keebaugh*, 100 F.4th at 1021, where the Ninth Circuit determined an advisal was conspicuous. There, "the design elements use[d] 'a contrasting font

1   color' making the notice legible on the dark background." *Id*. (citation omitted).  Further, the
2   notice was "conspicuously displayed directly . . . below the action button," and "the statement
3   'clearly denote[d] that continued use' [would] constitute acceptance of the Terms of Service." *Id*.
4   (citation omitted).  Lastly, "the link to the Terms of Service '[was] conspicuously distinguished
5   from the surrounding text,' by a contrasting white font and emphasized through white borders
6   outlining the hyperlinks." *Id*. (citation omitted).  The Calm sign-in screen possesses nearly all of
7   these same qualities, and generally "lacks clutter." *Id*.

8       Bender disputes the conspicuousness of the advisal, but the cases upon which he relies are
9   distinguishable.  For example, in *Maree v. Deutsche Lufthansa AG*, No. 20-CV-885-MWF, 2021
10  WL 267853, at *4 (C.D. Cal. Jan. 26, 2021), the court determined the advisal on Expedia's
11  website was not conspicuous because the Terms of Use were "not highlighted, underlined, in all
12  capital letters, or displayed inside of a conspicuous and clickable box."  Moreover, the link to the
13  Terms appeared "on a cluttered page nestled between several lines of extraneous, colored and
14  bolded text." *Id*.  To contrast, the Calm app page underlines the Terms and Privacy Policy
15  hyperlinks, the page is uncluttered and high contrast, and there is no extraneous text to distract
16  users from the advisal.  *Maree*, then, does not persuade the Court to change course.

17      In *Applebaum v. Lyft, Inc*., 263 F. Supp. 3d 454, 466 (S.D.N.Y. 2017), the district court
18  considered a clickwrap agreement, noting it was not clear a reasonably prudent consumer would
19  have been on inquiry notice of Lyft's terms.  The court's analysis relied on the fact that the
20  hyperlink to the terms was in a light blue font set against a white background, making it difficult
21  to see, and lacked other indicia of a hyperlink "such as words to that effect, underlining, bolding,
22  capitalization, italicization, or large font." *Id*.  Unlike in *Applebaum*, the Calm advisal underlines
23  the hyperlinked material, it is in a font that contrasts with the background, and the notice itself is
24  written such that it is clear the Terms and Privacy Policy are separate, linked documents.
25  (ECF 20 ¶ 9.)

26      Additionally, Bender relies on *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (2021) and
27  *Colgate v. JUUL Labs, Inc*., 402 F. Supp. 3d 728 (N.D. Cal. 2019), for the proposition that merely
28  underlining hyperlinks is insufficient to put users on inquiry notice.  (ECF 30 at 14.)  The Court

9

disagrees. True, the *Sellers* court noted that the hyperlink there was only underlined, and "not set apart in any other way that may draw the attention of the consumer." *Sellers*, 73 Cal. App. 5th at 481. But this was coupled with the court's observation that the advisal was written in "extremely small print, outside the white box containing the payment fields where the consumer's attention would necessarily be focused." *Id*. As the Ninth Circuit has noted, there is no bright line rule about which design elements will effect conspicuous notice; rather it is "the context of the transaction" and the "placement of the notice" as a whole that drive the Court's inquiry. *Keebaugh*, 100 F.4th at 1019–20. The overall effect of the page in *Sellers* prevented a reasonably prudent internet user from being on notice of the terms, not the lone fact that the hyperlinks were the same color as the rest of the notice. Here, the Calm Welcome Page presents the advisal in a conspicuous font, set apart in high contrast from the background, without requiring the user to scroll to see it. (ECF 20 ¶ 9.) This is a far cry from *Sellers*, where the advisal was presented in miniscule font in a location the user would not normally look. As for *Colgate*, the advisal at issue differed from the Calm notice in that "the hyperlink to the Terms and Conditions was not a different color, underlined, italicized, or in any way visually distinct from the surrounding text." *Colgate*, 402 F. Supp. 3d at 764. Here, the Terms and Privacy Policy are both underlined and in a readable font directly below the button for creating an account. (ECF 20 ¶ 9.) For these reasons, neither case alters the Court's conclusion.

Lastly, Bender argues that the inclusion of a prominent "OR" and a white line setting off the email login feature from the login feature using social media, discourages users from reading down to the bottom of the page, where the advisal is located. (ECF 30 at 13.) Whatever the merits of this argument, the "OR" and white line dividing the page appears only at the "Login Page" and not the "Welcome Page." (*Compare* ECF 20 ¶ 9 *with* ECF 20 ¶ 11.) Since users view the "Welcome Page" immediately upon opening the app for the first time, Bender's arguments regarding subsequent Calm app screens do not alter the Court's analysis.

### B.     Manifestation of Assent

The second step in this contract formation framework requires the Court "to consider whether any action taken by the internet user—such as clicking a button or checking a box—

1  'unambiguously manifest[ed] his or her assent' to proposed contractual terms." *Godun*, 135 F.4th
2  at 710 (citation omitted).  Manifestation of assent occurs "where an internet user is 'explicitly
3  advised that the act of clicking will constitute assent to the terms and conditions of an
4  agreement.'" *Id*. at 710-11 (quoting *Berman*, 30 F.4th at 857).

   Here, the Calm notice states "[b]y tapping Continue or logging into an existing Calm account, you agree to our <u>Terms</u> and acknowledge that you have read our <u>Privacy Policy</u>, which explains how to opt out of offers and promos."  (ECF 20 ¶ 9.)  This language parallels the language approved by the Ninth Circuit in *Berman*.  *See* 30 F.4th at 858 ("This notice defect could easily have been remedied by including language such as, "By clicking the Continue >> button, you agree to the Terms & Conditions.").  Bender has presented no evidence that he did not click the button to continue on the Calm app or that he did not create an account.  Therefore, the Court finds no dispute of fact as to his manifestation of assent.

* * *

   For these reasons, the Court determines Bender entered into a valid agreement to arbitrate with Calm.com.

## II. EQUITABLE ESTOPPEL

   Having established the existence of a valid agreement between Bender and Calm.com, the Court turns to the question of whether Twilio, a nonsignatory, may enforce that agreement.

   "[A] litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 632 (2009)).  Under California law, the doctrine of equitable estoppel permits a nonsignatory to enforce an arbitration clause in two scenarios:  "(1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are 'intimately founded in and intertwined with' the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and 'the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement.'" *Id*. at 1128-29; *see also*

*Gonzalez v. Nowhere Beverly Hills LLC*, 107 Cal. App. 5th 111, 118-20 (2024) (holding equitable estoppel applies when "the claims the plaintiff asserts against the nonsignatory [are] dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause"). Here, Twilio may enforce the arbitration agreement between Bender and Calm.com based on this first theory of equitable estoppel.[2]

To determine whether Bender's claims against Twilio are "intimately founded in and intertwined with" the Calm Terms of Service, the Court looks "at the relationship between the parties and their connection to the alleged violations." *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 707 (9th Cir. 2024) (quoting *Franklin v. Cmty. Reg'l Med. Ctr.*, 998 F.3d 867, 875 (9th Cir. 2021)). The purpose behind equitable estoppel is to prevent a party from "relying on an agreement for one purpose while disavowing the arbitration clause of the agreement." *Goldman v. KPMG, LLP*, 173 Cal. App. 4th 209, 230 (2009). So, the Court considers whether Bender's "claims are fully viable without reference to" the Calm Terms of Service. *Id*.

Bender's theory of injury is that Twilio's SDK transmitted user information, and users "could not have consented to Twilio's data collection practices" because they were unaware of the SDK. (ECF 1 ¶ 5.) Indeed, each of his three causes of action require the defendant's access to, or use of, the information be unauthorized. *See* 18 U.S.C. § 2511(2)(d) ("It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception . . . ."); Cal. Penal Code § 502(c) (providing for various prohibitions, which require knowing access by the defendant "without permission"); Cal. Penal Code § 631(a) (prohibiting "any unauthorized connection"). Consequently, whether Bender consented to transfer of his information from the Calm app to Twilio is an essential element of his claims. *See, e.g.*, *Perry-Hudson*, 2024 WL 4933332, at *2 (noting the plaintiff's privacy claims, including those under CIPA, required the plaintiff to plead he did not consent to disclosure of his information); *Bui-Ford v. Tesla, Inc.*, No. 4:23-CV-02321,

---

[2] Since Twilio may enforce the arbitration agreement under the first theory of equitable estoppel, the Court need not, and does not, reach the parties' arguments regarding the second theory.

12

1  2024 WL 694485, at *5 (N.D. Cal. Feb. 20, 2024) (same for CDAFA).

2  The Calm Privacy Policy discusses such transfer of user information to third parties, like
3  Twilio, and is therefore critical to the issue of consent. (ECF 20-4 at 5, 10; 20-5 at 5, 10; 20-6 at
4  4, 8-9.) For instance, under the heading "Sharing of Information," the policy states Calm.com
5  shares user information "with companies and contractors that perform services for us, including
6  email service providers, payment processors, fraud prevention vendors and other service
7  providers." (ECF 20-6 at 4.) Further, under the heading "Information for California Residents,"
8  the policy provides additional details on "parties with whom information may be shared":

> Companies that provide services to us, such as those that assist us with customer support, subscription and order fulfillment, advertising measurement, communications and surveys, data analytics, fraud prevention, cloud storage, bug fix management and logging, and payment processing. Third parties with whom you consent to sharing your information, such as with social media services or academic researchers. Our advertisers and marketing partners, such as partners that help determine the popularity of content, deliver advertising and content targeted to your interests, and assist in better understanding your online activity. Government entities or other third parties for legal reasons, such as to comply with law or for other legal reasons as described in our Sharing section.

(*Id*. at 8-9.) These provisions are "intimately founded in and intertwined with" Bender's claims because they govern how Calm.com may share user information with third parties—like Twilio—and whether Bender consented to such transfer. *Kramer*, 705 F.3d at 1128. Since the issue of consent is critical to his causes of action, it cannot be said his "claims are fully viable without reference to" the policy. *Goldman*, 173 Cal. App. 4th at 230.

To counter, Bender advances four arguments, none of which persuades. First, he argues the elements of equitable estoppel set out in cases like *Kramer*, 705 F.3d at 1128, is an incorrect interpretation of California law. (ECF 30 at 18-23.) But this Court may not simply depart from controlling Ninth Circuit authority. Indeed, Ninth Circuit precedent interpreting state law is "binding in the absence of any subsequent indication from the California courts that [the Ninth Circuit's] interpretation was incorrect." *AGK Sierra De Montserrat, L.P. v. Comerica Bank*, 109 F.4th 1132, 1136 (9th Cir. 2024). Bender has not supplied any case to indicate as much. At best, he cites *Alameda Cnty. Deputy Sheriff's Assn. v. Alameda Cnty. Employees' Ret. Assn.*, 9 Cal. 5th

13

1032, 1071 (2020), as an example of the California Supreme Court applying a different equitable estoppel test that post-dates decisions like *Kramer*. However, *Alameda Cnty. Deputy Sheriff's Assn.* was not about an arbitration agreement and did not discuss *Metalclad Corp. v. Ventana Env't Organizational P'ship*, 109 Cal. App. 4th 1705, 1708 (2003), or the line of cases following it. In fact, *Alameda Cnty. Deputy Sheriff's Assn.*, involved application of equitable estoppel against a public entity, which requires a more exacting standard than the application of the doctrine among private parties. 9 Cal. 5th at 1072 ("The government may be bound by an equitable estoppel in the same manner as a private party, but the doctrine is invoked only in those exceptional cases where justice and right require—that is, when the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (internal quotations omitted)). So, Bender's cited authority does not amount to an indication by the California courts that the Ninth Circuit's interpretation of equitable estoppel was incorrect.

Second, he asserts the Privacy Policy is not incorporated into the Calm Terms of Service, and thus, the agreement containing the arbitration provision is not intertwined with his claims. (ECF 30 at 24-25.) The Court disagrees. Under California law, "[w]here it is clear that a party is assenting to a contract that incorporates other documents by reference, the incorporation is valid—and the terms of the incorporated document are binding—so long as the incorporation is 'clear and unequivocal, the reference [is] called to the attention of the other party and he [ ] consent[s] thereto, and the terms of the incorporated document [are] known or easily available to the contracting parties.'" *In re Holl*, 925 F.3d 1076, 1084 (9th Cir. 2019). As shown in the Court's analysis of contract formation, *supra*, Bender was required to agree to Calm.com's Terms and acknowledge he had read the Privacy Policy prior to creating an account. (ECF 20 ¶ 9.) Both terms were underlined and provided a hyperlink to the relevant documents. (*Id.*) Further, upon clicking the hyperlink to the Calm Terms of Service, the user is directed to a page which displays those terms. (*Id.* ¶ 15.) The first sentence of that page refers the user once again to the Privacy Policy and provides a hyperlink. (*Id.*) Lastly, in the arbitration provision, the agreement includes "any claims related to privacy or data security" within the scope of arbitrable disputes. (ECF 20-2

14

at 13.) Together, these references to the Privacy Policy constitute clear incorporation by reference in the Calm Terms of Service. Though Bender argues the reference to the Privacy Policy appears above the heading, "Calm Terms of Service," he provides no legal authority to suggest the location of the reference in the document somehow defeats incorporation. The Court therefore rejects this argument.

Third, Bender argues equitable estoppel does not apply here because the Calm Terms of Service specifically limit the agreement to signatories and do not confer any benefits on third parties. (ECF 30 at 16 (citing ECF 20-2 at 17 ("[T]hese terms are intended solely for the benefit of the parties and are not intended to confer third-party beneficiary rights upon any other person or entity.")).) This argument misunderstands the law of equitable estoppel. The doctrine exists to address matters of equity and is a distinct framework from the theory of third-party beneficiaries to contract. *See, e.g.*, *Arthur Andersen LLP*, 556 U.S. at 631 ("'[T]raditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel . . . .'"). Ultimately, the Terms' third-party beneficiary provision has no bearing on the application of equitable estoppel, which concerns whether Bender's claims are so intertwined with Calm's Terms of Service that it would be unfair to allow him to avoid arbitration under those terms. *See Franklin*, 998 F.3d at 875.

Fourth, Bender cites *Jensen v. U-Haul Co. of California*, 18 Cal. App. 5th 295, 306 (2017), to assert that even if his "claims 'touch matters' relating to the arbitration agreement, 'the claims are not arbitrable'" because they do not rely "on the agreement to establish [his] cause of action." (ECF 30 at 24.) But *Jensen* is distinguishable. There, the plaintiff was injured while driving a rented truck to transport certain items for work. 18 Cal. App. 5th at 298-99. The plaintiff's supervisor had rented the truck from the defendant, and entered into an agreement to arbitrate, but this was unknown to the plaintiff who had not signed any agreement. *Id*. The California Court of Appeal held equitable estoppel did not apply to force the plaintiff to arbitrate, since his negligence and loss of consortium claims were not "founded in or bound up with the terms or obligations of [the rental agreement]." *Id*. at 306. Further, the court noted that estoppel may have been
15

appropriate had the plaintiff's *supervisor* been the one to bring such claims, since he was a party to the arbitration agreement. *Id*. at 307.  These facts differ from the instant case in that Bender's claims are "founded in or bound up with" the Calm Terms of Service.  Bender is a signatory to the agreement, and authorization is an essential element of his claims, which directly implicate the third-party data-sharing provisions of the Privacy Policy.  Indeed, he even concedes in his opposition that the policy "might be relevant to" the issue of consent, but mischaracterizes consent as an affirmative defense.  (ECF 30 at 24.)  The clear language of 18 U.S.C. § 2511, CIPA, and CDAFA contradicts this characterization, and so the Calm Terms of Service and Privacy Policy become essential to his claims.  Ultimately, "[t]he linchpin for equitable estoppel is equity—fairness."  *Perry-Hudson*, 2024 WL 4933332, at *3 (quoting *Goldman*, 173 Cal. App. 4th at 220).  Much like in *Perry-Hudson*, Bender could have sued Calm.com "on essentially the same set of allegations," but would have been required to arbitrate those claims.  *Id*.  Equitable estoppel prevents such attempts to artfully plead around an inconvenient arbitration agreement.

Accordingly, the Court determines Twilio may enforce the agreement to arbitrate between Bender and Calm.com under the theory of equitable estoppel.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Twilio's motion to compel arbitration.  The case is **STAYED** pending arbitration.  *See Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).  Having found the motion appropriate for determination on the papers, the Court **VACATES** the August 14, 2025 hearing.  *See* Fed. R. Civ. P. 78; Civ. L.R. 7-1(b).  All other pending motions are **TERMINATED AS MOOT**.

This Order disposes of Docket No. 19.

**IT IS SO ORDERED.**

Dated: August 11, 2025

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**